# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**SAM RISE, TAMAR JUNE, SONALEE RASHATWAR, ALDEN DIRKS, VERONICA MOSQUEDA, SHARMIN HOSSAIN, TREACY GAFFNEY, NOELLE GORMAN,** and **BETH GEN,**

Plaintiffs,

v.

**MPD COMMANDER JASON BAGSHAW, JOHN DOE SUPERVISING MPD OFFICERS 1-10,** and **JOHN DOE MPD OFFICERS 1-50;**
Metropolitan Police Department Officers
c/o Office of the Attorney General of the District of Columbia
400 6th Street NW,
Washington D.C. 20001

and

**JOHN DOE SUPERVISING USCP OFFICERS 1-10** and **JOHN DOE USCP OFFICERS 1-50;**
United States Capitol Police Officers
c/o Office of the Attorney General of the United States
950 Pennsylvania Avenue NW
Washington DC 20530

and

**THE DISTRICT OF COLUMBIA**

Case No.: 24-2388

**COMPLAINT**

JURY TRIAL DEMANDED

c/o Mayor and Office of the Attorney
General
for the District of Columbia
400 6th Street NW
Washington, D.C. 20001


                    Defendants.

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

INTRODUCTION.........................................................................................................1

JURISDICTION AND VENUE ....................................................................................6

PARTIES .......................................................................................................................6

    I. Plaintiffs ...............................................................................................................6

    II. Defendants..........................................................................................................9

STATEMENT OF FACTS .........................................................................................11

    I. Events Precipitating the November 15, 2023 Protest .......................................11

    II. November 15, 2023 Protest .............................................................................15

    III. Police Response to the November 15, 2023 Protest .......................................18

        A.    Defendant Officers Used Chemical Weapons and Kettling Tactics on Protesters Without Provocation................................................20

        B.    Defendant Officers Perpetrated Extreme and Gratuitous Violence Against Protesters for Their Mere Presence and Speech Outside of the DNC Building. ..............................................22

        C.    Defendant Officers Deliberately Targeted Protesters' Speech As Well As Their Symbols of Liberation and Loss...............................25

        D.    On-Site Supervisors Had an Opportunity to Intervene and Chose to Do Nothing..........................................................25

    IV. Impact of the Police Brutality.........................................................................28

    V. Plaintiffs' Experiences at the Protest................................................................29

        A.    Sam Rise (they/them) .................................................................30

        B.    Tamar June (she/her).................................................................35

        C.    Sonalee Rashatwar (they/he).....................................................38

        D.    Alden Dirks (they/them) ............................................................40

E.      Veronica Mosqueda (she/her) ..................................................... 43

F.      Sharmin Hossain (she/her) ........................................................ 46

G.      Treacy Gaffney (she/her) .......................................................... 49

H.      Noelle Gorman (she/her) ........................................................... 52

I.      Beth Gen (they/them) ............................................................... 55

CLAIMS FOR RELIEF ...................................................................................... 57

Count I: Fourth Amendment Excessive and Unreasonable Force................... 58

Count II: Common Law Assault and Battery ....................................... 63

Count III: First Amendment Retaliation ............................................ 65

Count IV: Fourth Amendment Unlawful Seizure ................................. 69

Count VI: Negligence Per Se............................................................. 70

REQUEST FOR RELIEF ................................................................................... 72

## INTRODUCTION

1.      On November 15, 2023, Plaintiffs were pleading for peace outside of the Democratic National Committee headquarters with their hearts and minds on Gaza. They gathered with a multi-faith, multi-racial group of protesters to lift up the sanctity of human life and call upon lawmakers for a ceasefire in Palestine. Instead of peace, they were met with violence and destruction at the hands of Metropolitan Police Department and United States Capitol Police Officers. The officers' unjustified brutality, including strangulation, sexual assault and the use of carcinogenic chemical weapons, violated Plaintiffs' rights under the United States Constitution and District of Columbia law. This action seeks to vindicate their rights.

2.      Since October 7, 2023, the Israeli military has killed nearly 40,000 Palestinians living in Gaza (conservatively estimated).[1] By unconditionally funding[2]

---

[1] *See Explainer: Gaza death toll: how many Palestinians has Israel's campaign killed?*, REUTERS (July 26, 2024), https://reut.rs/4dIbQbv. The actual death toll of Israel's military assault is likely to be significantly higher, because Israel has destroyed much of the Gaza Health Ministry's infrastructure, making data collection increasingly difficult. More than 10,000 Palestinians are estimated to be buried under the rubble, and tens of thousands more have or will likely be "indirectly" killed by reproductive, communicable, and non-communicable diseases. *See* Rasha Khatib, Martin Mckee & Salim Youssef, *Counting the dead in Gaza: difficult but essential*, THE LANCET, Volume 404, Issue 10449, at 237–38 (July 5, 2024), *available at* https://bit.ly/3AjF8yx. As such, The Lancet—a highly regarded, peer-reviewed medical journal—estimates that 186,000 "or even more deaths could be attributable to the current conflict in Gaza." *Id.*

[2] Phil Stewart & Idrees Ali, *No U.S. conditions on security assistance to Israel, Austin says*, Reuters (Oct. 12, 2023), https://reut.rs/3SSgdIR; Sharon Zhang, *$26B in Unconditional Aid to Israel Passes House With Just 58 Voting Against*, TRUTHOUT (Apr. 22, 2024), https://bit.ly/4dAZa66.

1

what the International Court of Justice has determined is a plausible genocide, the United States is complicit in those deaths.[3]

3.      Nearly 80% of Democratic voters, including Plaintiffs Sam Rise, Tamar June, Sonalee Rashatwar, Alden Dirks, Veronica Mosqueda, Sharmin Hossain, Treacy Gaffney, Noelle Gorman, and Beth Gen, believe that the United States should instead use its leverage to demand that Israel implement a ceasefire to preserve sacred Palestinian life.[4]

4.      Shortly after Israel launched its indiscriminate[5] attack on Gaza, a small minority of Democratic lawmakers, spearheaded by U.S. Representative Cori Bush, called on President Joe Biden "to immediately call for and to facilitate de-escalation and a cease-fire in Israel and [the occupied] Palestinian Territories," as well as to "promptly send and facilitate the entry of humanitarian assistance into Gaza."[6] Only 18 of the approximately 212 Democratic lawmakers in the U.S. House of

---

[3] In January 2024, the International Court of Justice found it "plausible" that Israel's military offensive on Gaza constitutes genocide, in violation of the Genocide Convention. *See* Fatima Al-Kassab, *A top U.N. court says Gaza genocide is 'plausible' but does not order cease-fire*, NPR (Jan. 26, 2024), https://n.pr/3M3kTrK.

[4] *Voters Want the U.S. to Call for a Permanent Ceasefire in Gaza and to Prioritize Diplomacy*, DATA FOR PROGRESS (Dec. 5, 2023) (according to a November 2023 poll, 76% of voters support the U.S. calling for a permanent ceasefire and a de-escalation of violence in Gaza), https://bit.ly/4fJicsI.

[5] Thematic Report, *Indiscriminate and disproportionate attacks during the conflict in Gaza (October – December 2023)*, United Nations Human Rights Office of the High Commissioner (June 19, 2024), https://bit.ly/3yJAUjp.

[6] Calling for an immediate deescalation and cease-fire in Israel and occupied Palestine, H.R. 786, 118th Cong. (2023), https://bit.ly/4dvGG7a.

Representatives co-sponsored the resolution. Most Democratic lawmakers range from apathetic to supportive of Israel's military assault.[7]

5.      On November 15, 2023, Plaintiffs, along with a multi-faith, multi-racial group of more than one hundred protesters, gathered outside the headquarters of the Democratic National Committee (DNC) in Washington, D.C. to ask their representatives to join Rep. Cori Bush's ceasefire resolution.

6.      Within minutes of assembling at the DNC headquarters—to sing, chant, and display messages reminding legislators of the sanctity of human life and urging a ceasefire—officers employed by the Metropolitan Police Department (MPD) and the United States Capitol Police (USCP) descended on protesters en masse.

7.      Without any provocation, MPD and USCP Defendant Officers violently broke up the protest. In violation of D.C. law, they did so without issuing formal dispersal orders.

---

[7] "The Biden administration has requested $14.3 billion for Israel's war effort," which "[n]o Democrats have said they would not back." In fact, "[l]eaders of both parties have largely dismissed calls for conditions as unnecessary, and warned that they would hamstring Israel's military strategy." Karoun Demirjian, *As Congress Weighs Aid to Israel, Some Democrats Want Strings Attached*, THE NEW YORK TIMES (Nov. 29, 2023) (describing efforts by a minority of Democrats to condition military aid to Israel), https://nyti.ms/4do627b; *see also US lawmakers lag voters in support for Gaza ceasefire*, Al Jazeera (Dec. 6, 2023) ("A new poll says more than 60% US voters want ceasefire, while only 11% of lawmakers support an end to Israel's war."), https://bit.ly/3M4FHyS; Marc Rod & Emily Jacobs, *House passes Israel aid bill 366-58, with 37 Dem, 21 GOP votes in opposition*, JEWISH INSIDER (Apr. 20, 2024) ("The House voted 366-58 on Saturday to approve $14.3 billion in additional U.S. aid to Israel," with only 37 Democrats opposed).

8.     Defendant Officers used indiscriminate force to clear protesters who were singing and chanting on the front steps of the DNC building and the surrounding sidewalks.

9.     Despite the fact that protesters were not blocking any entrances or attempting to enter the building, Defendant Officers grabbed, shoved, and threw Plaintiffs Sam Rise, Tamar June, Alden Dirks, Veronica Mosqueda, Sharmin Hossain, and Beth Gen down the steps to the building. They forcefully rammed bikes and barricades into Plaintiffs Sam Rise, Tamar June, Sonalee Rashatwar, Treacy Gaffney, and Noelle Gorman to push them away from the building and to the other side of the street. Plaintiffs' bodies were battered and bruised as a result and ached for days after the protest.

10.     Inexplicably and unjustifiably, Defendant Officers also used chemical weapons. They pepper sprayed protesters, including Plaintiffs Alden Dirks, Noelle Gorman, and Treacy Gaffney, without warning or provocation. They deployed tear gas, causing Plaintiffs Sam Rise, Tamar June, Veronica Mosqueda, and Sharmin Hossain great physical distress. Plaintiffs' eyes burned, they struggled to see, and they felt disoriented.

11.     Defendant Officers sexually assaulted protesters, including by intentionally and forcefully groping Plaintiff Sonalee Rashatwar's breasts. They also strangled Plaintiffs Alden Dirks and Veronica Mosqueda with their bare hands.

12.     This violent dispersal was designed to suppress Plaintiffs' political expression in support of Palestinian life. In fact, MPD and USCP Defendant Officers

intentionally targeted Plaintiffs because of the content of their speech. They strangled a number of protesters, including Plaintiffs Sam Rise and Tamar June, with the kefiyyehs they donned in solidarity with the Palestinian movement, physically and symbolically stifling their speech.[8] The officers stomped on and destroyed a candlelight vigil commemorating the more than 11,000 Palestinian lives lost that Plaintiffs Sam Rise and Noelle Gorman helped create. A Defendant Officer forcefully grabbed at and intentionally tore Plaintiff Alden Dirks's shirt, which read "Ceasefire Now."

13.     MPD and USCP officers receive training from the Israeli police and military. The gratuitous violence MPD and USCP Defendant Officers used and condoned to violently disperse the November 15, 2023 protest is emblematic of the tactics the Israeli police and military use to stifle dissent.[9]

14.     Throughout this violent dispersal, a number of supervising officers from MPD and USCP—including MPD Commander Jason Bagshaw—stood by and watched as their officers inflicted unreasonable and excessive force on Plaintiffs and

---

[8] A kefiyyeh is a traditional Arab headdress worn by nomadic communities in Palestine. For many Palestinians, a kefiyyeh symbolizes their yearning for freedom. Many non-Palestinians don the kefiyyeh in a show of solidarity. "It's both a historical artifact that documents the story of a people and a living symbol that inspires hope." Abdallah Fayyad, *How the keffiyeh became a symbol of the Palestinian cause*, VOX (Dec. 6, 2023), https://bit.ly/3yzGswN.

[9] *See, e.g.*, *With Whom are Many U.S. Police Departments Training? With a Chronic Human Rights Violator - Israel*, AMNESTY INTERNATIONAL (Aug. 25, 2016) ("There are also documented incidents of suppression of freedom of expression by Israeli police. For instance, journalists covering protests have been assaulted or shot."), https://bit.ly/3AlcuNE.

dozens of other protesters. They did not intervene or instruct Defendant Officers to stop their illegal assault, nor did they issue a clear dispersal order or create a clear exit route.

15.    Plaintiffs bring this action seeking redress of MPD and USCP Defendant Officers' violations of their rights under federal and state law.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the First and Fourth Amendments to the United States Constitution. This Court also has jurisdiction under 28 U.S.C. § 1343 because the action seeks to redress the deprivation of civil rights under 42 U.S.C. § 1983.

17.    Plaintiffs' claims under the laws of the District of Columbia arise from the same events as the federal claims and are therefore within the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

18.    Venue is proper in this Court under 28 U.S.C § 1391(b)(2) because the events that give rise to this action occurred in the District of Columbia.

## PARTIES

### I.    Plaintiffs

19.    **Samantha Rise** Roberson ("Sam Rise," they/them) is a multi-racial Black, non-binary organizer, teaching artist, and performer. Sam has been active in the global movement for Palestinian self-determination and freedom since 2021. On November 15, 2023, Sam traveled to the DNC headquarters in Washington, D.C. to

"protest the use of United States tax dollars and weaponry to aid and abet Israel's genocide in Gaza." As a former delegate, canvasser, and organizer for the DNC, Sam knows how important it is for lawmakers to hear directly from their constituents. Sam was calling on Democratic Party leadership to condemn Israel's indiscriminate military assault on Gaza and demand a ceasefire. Sam felt called to do this because they view Israel's violence against Palestinians as directly related to state violence against marginalized communities in the United States.

20.     **Tamar June** (she/her) is an Ashkenazi Jewish woman and a member of Jewish Voice for Peace. She is a psychotherapist by profession. Tamar is among the majority of U.S. residents who support a ceasefire in Gaza,[10] a position which she views as a moral imperative based on both her personal and professional identities. On November 15, 2023, Tamar was outside the DNC headquarters to protest the Democratic Party's support for the Israeli military's violent aggression on Gaza.

21.     **Sonalee Rashatwar** (they/he) is a licensed clinical social worker. For weeks before the protest at the DNC headquarters, Sonalee had been calling their Congressional representatives and urging them to save Palestinian lives by signing Rep. Cori Bush's Ceasefire Resolution, H.Res.786. Sonalee attended the protest at the DNC headquarters because they wanted to continue urging Democratic lawmakers to implement a ceasefire in Gaza.

22.     **Alden Dirks** (they/them) is a queer mycologist (fungal biologist), anti-war activist, and registered Democratic voter. They care about the wellbeing of all

---

[10] *See supra* n.4.

human beings, including Palestinian human beings. Alden attended the protest at the DNC headquarters because they wanted to urge Democratic lawmakers to implement a ceasefire in Gaza.

23.    **Veronica Mosqueda** (she/her) is a community organizer. She believes that all freedom struggles are deeply connected. Veronica objects to Congress allocating U.S. tax dollars to weapons that kill Palestinian people.[11] Veronica chose to attend the protest at the DNC headquarters because she understands that members of Congress decide how to spend tax dollars.[12] She specifically hoped to urge Democratic lawmakers to save Palestinian lives by implementing a ceasefire.

24.    **Sharmin Hossain** (she/her) is a Muslim woman and organizer. Since October 7, Sharmin has grown increasingly alarmed by Israel's escalation of violence against Palestinians in the Occupied Territories. Sharmin attended the protest at the DNC headquarters to demand Democratic lawmakers call for a ceasefire in Gaza.

25.    **Treacy Gaffney** (she/her) is a mutual aid organizer and peace activist. She is among the majority of U.S. residents who support a ceasefire in Gaza.[13] Treacy attended the protest at the DNC headquarters to "get her representatives' attention, demand that the U.S. stop funding Israel's ongoing genocide in Gaza, and to support a ceasefire."

---

[11] "Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities." THE WHITE HOUSE (Oct. 20, 2023), https://bit.ly/4fDYe2B.

[12] *Id.*

[13] *See supra* n.4.

8

26. **Noelle Gorman** (she/her) is a legal assistant and former teacher. Noelle objects to state-sanctioned violence at home and abroad. She has friends and colleagues who are trapped in Gaza, and she receives on-the-ground reports of their suffering. Noelle decided to attend the November 15 protest because she wanted to help save Palestinian lives by demanding a ceasefire from Democratic lawmakers who have the power to implement a ceasefire.

27. **Bethany Gen** (Beth Gen, they/them) is a Chinese-American graduate student. They bore witness to Palestinian suffering for weeks and felt frustrated by the Democratic Party's support for U.S. military aid that was killing Palestinians. Before November 15, 2023, Beth had been contacting their local and state representatives, asking them to push for a ceasefire, but did not feel heard. Beth attended the protest at the DNC headquarters because it was another opportunity to publicly urge Democratic lawmakers to demand a ceasefire in Gaza.

## II.    Defendants

28. **Commander Jason Bagshaw** is the commander of the Special Operations Division of the Metropolitan Police Department who was present at the November 15, 2023 protest at issue in this case. At all times relevant, Defendant Bagshaw was acting within the scope of his employment as an MPD commander and under color of the laws of the District of Columbia. He is sued in his individual capacity.[14]

---

[14] Racial justice activists in Washington D.C. have described Defendant Jason Bagshaw as "an overly-involved, threatening and violent officer" and have been

9

29.     **John Doe Supervising MPD Officers 1–10** (Supervising MPD Defendant Officers) are commanders, inspectors, captains, lieutenants, or sergeants within the MPD that were present at the November 15, 2023 protest at issue in this case. At all times relevant, Supervising MPD Defendant Officers were acting within the scope of their employment as MPD commanders, inspectors, captains, lieutenants, or sergeants and under color of the laws of the District of Columbia. They are sued in their individual capacities.

30.     **John Doe Supervising USCP Officers 1–10** (Supervising USCP Defendant Officers) are inspectors, captains, lieutenants, or sergeants within the USCP that were present at the November 15, 2023 protest at issue in this case. At all times relevant, Supervising USCP Defendant Officers were acting within the scope of their employment as USCP inspectors, captains, lieutenants, or sergeants. Additionally, at all times relevant, USCP Supervising Defendant Officers were acting under the color of the laws of the District of Columbia, or, in the alternative, pursuant to a civil conspiracy with Supervising MPD Defendant Officers. They are sued in their individual capacities.

31.     **John Doe MPD Officers 1–50** (MPD Defendant Officers) are officers of the Metropolitan Police Department (MPD), subject to the supervision of Supervising MPD Defendant Officers. They were present at the November 15, 2023 protest at issue in this case. At all times relevant, all MPD Defendant Officers were

---

calling on MPD to fire him for years. *See* Ellie Silverman and Peter Hermann, *D.C. police shooting of man at Wharf reignites old debates*, THE WASHINGTON POST (July 24, 2022), https://wapo.st/3YRSz2O.

acting within the scope of their employment as MPD officers and under color of the laws of the District of Columbia. They are sued in their individual capacities.

32.     **John Doe USCP Officers 1–50** (USCP Defendant Officers) are officers of the United States Capitol Police (USCP), subject to the supervision of Supervising USCP Defendant Officers. They were present at the November 15, 2023 protest at issue in this case. At all times relevant, all USCP Defendant Officers were acting within the scope of their employment as USCP officers. Additionally, at all times relevant, USCP Defendant Officers were acting under the color of the law of the District of Columbia or, in the alternative, pursuant to a civil conspiracy with MPD Defendant Officers. They are sued in their individual capacities.

33.     **Defendant District of Columbia** is a municipal corporation and the local government of Washington, D.C. It operates and governs MPD, which is a *non sui juris* entity, under the laws of the District of Columbia. In this case, the District acted through its agents and employees, including Defendant Jason Bagshaw, Supervising MPD Defendant Officers, and MPD Defendant Officers.

## STATEMENT OF FACTS

### I.    Events Precipitating the November 15, 2023 Protest

34.     On October 7, 2023, the military wing of Hamas launched "Operation al-Aqsa Flood" on Israeli soil in response to[15] the continued illegal Israeli occupation of

---

[15] *See generally* Samia Nakhoul & Laila Bassam, *Secretive Hamas military chief masterminded Oct 7 strike on Israel*, REUTERS (May 20, 2024) ("Deif said in his recording that Hamas had repeatedly warned Israel to stop its crimes against Palestinians, to release prisoners and to halt its expropriation of Palestinian land."), https://reut.rs/4fSlpqa.

the Palestinian territories,[16] the blockade of the Gaza Strip (Gaza),[17] the expansion of illegal Israeli settlements,[18] and rising Israeli settler violence in the West Bank.[19] Approximately 1,200 Israeli civilians and soldiers were killed that day.

35.    In retaliation, Israel launched an indiscriminate military offensive on Gaza,[20] a densely populated strip of Palestine that has been under Israeli siege for 16 years,[21] and also cracked down on Palestinians living in the West Bank.[22] Since

---

[16] Raffi Berg, *UN top court says Israeli occupation of Palestinian territories is illegal*, BBC (July 19, 2024) ("The International Court of Justice (ICJ) said Israel should stop settlement activity in the occupied West Bank and East Jerusalem and end its 'illegal' occupation of those areas and the Gaza Strip as soon as possible."), https://bbc.in/3SJeKVf.

[17] Raja Abdulrahim, *Gaza Has Suffered Under Blockade*, THE NEW YORK TIMES (Oct. 7, 2023), https://nyti.ms/4fUAcRh.

[18] *Settlement Expansion in Occupied Palestinian Territory Violates International Law, Must Cease, Many Delegates Tell Security Council*, Meetings Coverage and Press Releases, UNITED NATIONS (Sep. 27, 2023), https://bit.ly/3M8nsIJ.

[19] Fact Sheet, *Displacement of Palestinian herders amid increasing settler violence*, United Nations Office for the Coordination of Humanitarian Affairs (Sep. 21, 2023), https://bit.ly/4dFKGli.

[20] *See supra* n.5.

[21] Raja Abdulrahim, *Gaza Has Suffered Under Blockade*, THE NEW YORK TIMES (Oct. 7, 2023), https://nyti.ms/4fUAcRh.

[22] Isaac Chotiner, *What's Behind Israel's Crackdown In the West Bank?*, THE NEW YORKER (Jan. 4, 2024), https://bit.ly/3YFjkHG.

October 7, the Israeli military has dropped thousands of bombs on the Gaza Strip,[23] severely limited humanitarian aid entering Gaza,[24] and at times imposed a communications blockade on Palestinians living there.[25]

36.    Immediately after Israel launched its military offensive on October 7, President Joe Biden offered "unwavering" material support for Israel's campaign,[26] which he and administration officials consistently reinforced, even as mass civilian casualties escalated, and even as Israel sealed off Gaza, restricting access to basic life necessities.[27] Beginning October 7, the United States provided Israel with expedited and unconditional military support to aid its assault on Gaza—in addition to access to the existing stockpile of U.S. weapons already in Israel.

37.    By November 15, 2023, Israel's military assault on Gaza was reported to have killed over 11,000 Palestinians, primarily civilians, more than 4,500 of them

---

[23] Tamara Qiblawi, Allegra Goodwin, Gianluca Mezzofiore & Nima Elbagir, *'Not seen since Vietnam': Israel dropped hundreds of 2,000-pound bombs on Gaza, analysis shows*, CNN WORLD (Dec. 22, 2023), https://cnn.it/3YFjxdW.

[24] *Israel: Starvation Used as Weapon of War in Gaza*, HUMAN RIGHTS WATCH (Dec. 18, 2023), https://bit.ly/4cgTBbS.

[25] *Israel/OPT: Civilians in Gaza at unprecedented risk as Israel imposes communication black-out during bombardment and expanding ground attacks*, AMNESTY INTERNATIONAL (Oct. 27, 2023), https://bit.ly/3YF5yF2.

[26] *Statement from President Joe Biden Condemning Terrorist Attacks in Israel*, THE WHITE HOUSE (Oct. 7, 2023), https://bit.ly/3SSjKa5.

[27] *See* Humeyra Pamuk, Jonathan Saul & Maggie Fick, *Despite Gaza death toll soaring, U.S. unlikely to rethink weapons supplies to Israel*, REUTERS (Dec. 5, 2023), https://reut.rs/4dlSdWI.

children.[28] An additional 3,600 Palestinians were declared missing, including 1,750 children.[29] At least 1.6 million Palestinians had been internally displaced within Gaza, but because Gaza is under siege, nowhere is safe from Israel's barrage of bombs.[30]

38.    The depth of the humanitarian catastrophe unfolding in Gaza, as well as the United States' unwavering support for Israel's military assault, led to worldwide calls for the United States to broker a ceasefire.

39.    By October 18, 2023, fifteen House Democrats had co-sponsored a resolution (spearheaded by Rep. Cori Bush) calling on President Biden to implement a ceasefire and to send and facilitate the entry of humanitarian aid into Gaza.[31] That same day, President Biden visited Israel. He did not urge a ceasefire. Instead, he reaffirmed the United States' support of Israel's "military edge," and, two days later, requested Congress send Israel an additional $14.1 billion in military assistance.[32] On October 31, 2023, the Department of State submitted a formal notification to

---

[28] *Palestinian officials say harder to update Gaza casualty toll as health system buckles*, REUTERS (Nov. 15, 2023), https://reut.rs/3Aoz1cw.

[29] *Id.*

[30] OHCHR Press Release, *Gaza: UN human rights experts call on international community to prevent genocide against the Palestinian people*, UNITED NATIONS (Nov. 16, 2023), https://bit.ly/46OwcNS.

[31] Ryan Grim, *Reps. Pramila Jayapal, Maxwell Frost, and Greg Casar Join Call for Ceasefire in Gaza*, THE INTERCEPT (Oct. 20, 2023), https://bit.ly/3LZ8k0m.

[32] Michael D. Shear & Karoun Demirjian, *Biden Requests $105 Billion Aid Package for Israel, Ukraine and Other Crises*, THE NEW YORK TIMES (Oct. 20, 2023), https://nyti.ms/4clcMkY.

Congress of an approval of a $320 million transfer of defense articles to an Israeli company for the manufacture of precision bomb kits.[33] Many of the bombs Israel has used to kill Palestinian civilians are U.S.-made.[34]

## II.     November 15, 2023 Protest

40.     Against this backdrop, United States residents who felt that their lawmakers should unequivocally demand a ceasefire and halt military aid to Israel began protesting across the country. Protesters recognized that Washington, D.C., the seat of U.S. power, was an important and impactful place to apply political pressure.

41.     On November 15, 2023, the Democratic National Convention Campaign Committee hosted a private dinner at the private Democratic National Committee (DNC) headquarters to wine and dine Democratic Party members and fundraise for the Party. Numerous Democratic Congresspeople were present, including Representative Hakeem Jeffries and Representative Brad Sherman.

42.     A number of grassroots organizations seized on this opportunity to demand that more Democratic lawmakers join the calls for a ceasefire. They assembled at the DNC headquarters that evening to protest the United States' complicity in Israel's military assault and to demand that the United States broker a

---

[33] Natasha Bertrand, Alex Marquardt & Oren Liebermann, *US plans to transfer $320 million in precision bomb equipment to Israel in sale approved earlier this year*, CNN (Nov. 6, 2023), https://cnn.it/4fzZYdj.

[34] *See e.g.*, *U.S.-Made Weapons Used by Government of Israel in Violation of International Law and U.S Law*, AMNESTY INTERNATIONAL (Apr. 29, 2024), https://bit.ly/4dG3eSq.

ceasefire. Protesters chose to protest at the DNC headquarters because the United States, through its unconditional military support, makes possible Israel's mass killing of the Palestinian people. Further, by November 15, a growing (but still minority) number of Democratic lawmakers were publicly urging President Biden to call for a ceasefire.[35]

43.    A multi-faith, multi-racial group of people gathered at the DNC headquarters at around 7 pm. The streets around the building were quiet and empty.

44.    The protesters were there for one specific purpose: to talk to Democratic leaders as they came and went about their demand for a ceasefire.

45.    Every Plaintiff, along with more than 100 others, wore matching black shirts with large white letters stating, "Ceasefire Now" and "Jews Say Ceasefire Now / Not In Our Name," clearly demarcating themselves as protesters. Protesters gathered at different points outside the DNC building hoping to maximize their opportunities to appeal to Democratic lawmakers for a ceasefire.

46.    Plaintiffs were all in the group in front of the DNC building: some on the front steps and others on the sidewalks (on Ivy Street SE). The group on the front steps stood in the center, leaving plenty of space on the right and left, so that members of Congress could pass.

47.    A group of protesters stood on the sidewalk on the west side of the steps, holding light-up signs ("light boards") that read, "80% of Dem voters say ceasefire." A

---

[35] David Smith, *AOC leads Democrats urging Biden to call for Gaza ceasefire over children's rights*, THE GUARDIAN (Nov. 15, 2023), https://bit.ly/3X2DitR.

few more stood on the east side of the steps holding light boards that read "The world is watching." At their feet, protesters unfurled sheets with thousands of electric candles glued to them to represent the 11,000 Palestinian lives lost. Plaintiffs Sam Rise, Sharmin Hossain, and Noelle Gorman helped create these protest symbols.

48.    Protesters standing by the front door, including Plaintiff Sam Rise, carried a banner that read, "Ceasefire."



49.    Others projected words onto the DNC building, rotating the messages: "We Are All Children of Light," "Ceasefire Now," and "Let Gaza Live."



17

50.    One person's shoulders were draped in a Palestinian flag. Another person held a large Palestinian flag.

51.    Protesters, including Plaintiffs Noelle Gorman, Treacy Gaffney, and Veronica Mosqueda, stood on the public sidewalks in front of or across the street from the DNC entrance. They kept the roadway clear.

52.    Throughout the evening, protesters chanted "Ceasefire Now," and "Let Gaza Live": pleas for their elected leaders to pass a congressional ceasefire resolution. Others intoned, "The whole world is watching." Some sang, "Bombs fall on hospitals, but you don't hear the call. 'Cause AIPAC is paying you, does it weigh on you at all?"[36]

### III.    Police Response to the November 15, 2023 Protest

53.    Within minutes of the protesters assembling in front of the DNC building, officers from the Metropolitan Police Department and the United States Capitol Police arrived en masse.

54.    According to MPD General Order No. GO-RAR-310.01, which governs MPD's jurisdictional and operational responsibilities with respect to USCP, the DNC building (430 South Capitol Street SE, #3, Washington, DC 20003) is within MPD's geographical jurisdiction. This general order authorizes USCP to enforce D.C. or federal law in areas under MPD's control under specific circumstances, including the

---

[36] AIPAC, or the American Israel Public Affairs Committee, is a "pro-Israel group that has long been among Washington's most powerful lobbying forces." Kate Kelly & Kenneth P. Vogel, *Pro-Israel Lobby Faces Challenges Amid Gaza War and Shifting Politics*, THE NEW YORK TIMES (Mar. 13, 2024), https://nyti.ms/4fJdThd.

DNC headquarters. Maps from USCP confirm that the DNC building is not located in a geographic area in which demonstrations are restricted or prohibited.

55.     Without issuing any warning or dispersal order, MPD and USCP officers brutally attacked protesters who were assembled in front of the DNC building.

56.     While people were still arranging their displays of banners, candles, lights, and signs, police officers with bikes approached them along Ivy Street from the west. The police officers dismounted their bikes and climbed the side steps to storm the people at the front door, including Plaintiffs Sam Rise, Alden Dirks, Beth Gen, Sharmin Hossain, and Tamar June.

57.     More police officers arrived and began shoving protesters who were on the sidewalk holding light boards. The officers did not give any warnings, choosing instead to yell at protesters and put their hands on people all at once.

58.     The protesters holding light boards moved away from the south side of the DNC building into Ivy Street, verbalizing, "We are moving into the street" to the police.

59.     Despite the protesters' clear movement away from the building, the police attacked.

60.     Protesters holding light boards on Ivy Street watched in horror as Defendant Officers dragged, shoved, and threw people down the steps in front of the DNC building, including Plaintiffs Sam Rise, Alden Dirks, Beth Gen, Sharmin Hossain, and Tamar June.

61.     Defendant Officers grabbed and trampled protesters standing on the sidewalk in front of the building, including Plaintiffs Treacy Gaffney, Veronica Mosqueda, Sonalee Rashatwar, and Noelle Gorman.

## A. Defendant Officers Used Chemical Weapons and Kettling Tactics on Protesters Without Provocation.

62.     As Defendant Officers forcefully cleared the front steps, and without provocation, Defendant Officers deployed pepper spray on the individuals assembled there, including Plaintiff Alden Dirks. Soon, other Defendant Officers began pepper spraying protesters standing on Ivy Street, including Plaintiffs Noelle Gorman, Treacy Gaffney, and Sam Rise, despite their distance from the DNC building.

63.     There was no clear direction or place for protesters to go to avoid the officers' brutality. Police shoved and moved and beat protesters indiscriminately.

64.     In addition, the officers used kettling tactics to trap protesters.

65.     Over, and over, officers would form a line to block protesters from moving, forcing them to bear witness to the violence officers were inflicting behind them, only to start shoving the protesters again in another direction.

66.     The officers never communicated that the protesters needed to leave a specific area or go to a particular spot. At most, they barked, "Go back," or "Move," without more, while pushing and beating protesters. Because so many officers had swarmed the protesters, there was nowhere they could realistically go.

67.     For instance, a group of officers repeatedly shoved a protester into another police officer, making it impossible for the person to leave, while yelling

"move." Similarly, police shoved people to the ground, and, while they were on the ground, yelled at them to "back up."

68.    In another instance, police crushed people against the fence while telling them to move. The protesters verbalized, "They are crushing us against the fence and it hurts," but the officers did not stop.[37] Defendant Officers also pinned people against a car, including Plaintiffs Sam Rise, Tamar June, Alden Dirks and Sharmin Hossain.



69.    Eventually, police officers made two lines across Ivy Street on the west and east ends so that people inside the block could not exit.

70.    Plaintiff Alden Dirks saw an MPD or USCP Defendant Officer throw a flash bang grenade into the crowd on the sidewalk, at very close range to a large group of people.

---

[37]    *See* IfNotNow (@IfNotNowOrg), X (Nov. 16, 2023, 6:28 PM), https://bit.ly/3yGiSyA.

71.    The officers also used chemical weapons, including 6330 CS Vapor Grenades, which are carcinogenic. Plaintiffs Sam Rise, Alden Dirks, Veronica Mosqueda, and Sharmin Hossein were all in the vicinity when Defendant Officers deployed this tear gas.



**B. Defendant Officers Perpetrated Extreme and Gratuitous Violence Against Protesters for Their Mere Presence and Speech Outside of the DNC Building.**

72.    After MPD and USCP Defendant Officers violently dispersed the protesters standing on the front steps of the DNC building and the sidewalk immediately in front of it, they formed a line around the DNC building and gained full control over all entrances and exits. Additional USCP officers arrived outfitted in full body armor, shields, gas masks, goggles, and batons. They pushed and shoved

protesters with their hands and their shields even further away from the building. One of them threatened, "I will fuck you up out here!"[38]

73.     Some protesters still stood in an alley to the east of the DNC building, outside of the police line.

74.     Despite the police line in front of the DNC front door and many ways to guide DNC guests out of the building, armed police charged people standing in the alley without warning, hitting them with shields and batons. Officers even trampled people who were using wheelchairs and walkers, with blatant disregard for their vulnerabilities and disabilities.

75.     Plaintiff Noelle Gorman, who had relocated close to an alley to seek reprieve from the officers' violence in front of the DNC Headquarters, saw an officer grab a person out of their wheelchair and throw them onto the ground. She saw another officer shove a protester who was using a cane.

76.     Shortly after, officers escorted members of Congress out of the alley.

77.     Defendant Officers then pinned demonstrators outside the police line against the fence and parked cars on the south side of Ivy Street, including Plaintiffs Sam Rise, Alden Dirks, Tamar June, Noelle Gorman, and Sharmin Hossain.

78.     Officers hit people with batons and shields, even smashing the glasses of at least two protesters.

---

[38] Harriet's Dreams (@HarrietsDreams), X (Nov. 17, 2023, 8:08 AM), https://bit.ly/4clCtSu.

79.     Defendant Officers used barricades and bikes to shove people, including Plaintiff Treacy Gaffney, off the sidewalk between Ivy Street and the DNC, into Ivy Street, and then onto the Ivy Street south sidewalk.

80.     To escape the officers' unprovoked and unrelenting hostility, protesters, including Plaintiff Treacy Gaffney, hopped over a fence on the south side of Ivy Street and crossed into a parking lot. In a fit of rage, officers chased them into the parking lot, even though they had effectively retreated from the site of the protest.

81.     Defendant Officers did not issue any formal warnings or a dispersal order before engaging in these acts of violence.

82.     At some point in the evening, members of the MPD Bomb Squad arrived. The presence of the MPD Bomb Squad, and USCP officers in head-to-toe riot gear, is symptomatic of the all-too-common militarized police response to protests in support of Palestinians.[39]

83.     Indeed, Defendant Officers' unprovoked and excessive show of force in response to a vigil and protest in support of Palestinian life—marked by singing, chanting, and holding signs—is emblematic of the fact that both MPD and USCP have trained with the Israeli military in Israel.[40] Relying on the same tactics the Israeli military uses to stifle dissent, Defendant Officers engaged in extreme levels of violence to silence Plaintiffs' political speech.

---

[39] *See, e.g.*, Tim Dickinson, *College Crackdown Shines Spotlight on Violent Cops — Yet Again*, ROLLING STONE (Apr. 30, 2024), https://bit.ly/3yFusKd.

[40] *See supra* n. 9.

24

## C. Defendant Officers Deliberately Targeted Protesters' Speech As Well As Their Symbols of Liberation and Loss.

84.     Defendant Officers' conduct went far beyond crowd control. Some chose to shred protesters' "Ceasefire Now" shirts and clothing, including that of Plaintiff Alden Dirks.

85.     Defendant Officers strangled protesters with the kefiyyehs they wore around their necks to symbolize their support for Palestinian life and liberation— including Plaintiffs Sam Rise and Tamar June—physically and symbolically suppressing their speech and restricting their breathing and movement. Defendant Officers strangled other protesters, including Plaintiffs Alden Dirks and Veronica Mosqueda, with their bare hands.

86.     Plaintiffs Noelle Gorman and Veronica Mosqueda observed Defendant Officers deliberately destroying pro-Palestinian symbols at the protest, intentionally kicking and stepping on electric tea light candles protesters set up to represent the 11,000 Palestinian people Israel had killed since October 7. Officers also ripped a Palestinian flag out of a protester's hand.

## D. On-Site Supervisors Had an Opportunity to Intervene and Chose to Do Nothing.

87.     Throughout the evening, a number of police captains from both USCP and MPD, including Defendant Jason Bagshaw and other MPD and USCP Supervising Defendant Officers—marked by their white shirts—walked through the melee and simply watched their officers hurt people without provocation. At no point

did the supervising officers instruct the officers to stand down or otherwise intervene in their unlawful and egregious show of force.

88.    On information and belief, Defendant Jason Bagshaw and other Supervising Defendant Officers specifically instructed MPD and USCP Defendant Officers to immediately resort to the use of force to disperse the November 15, 2023 protest. Defendant Jason Bagshaw and other Supervising MPD Defendant Officers did not issue clear dispersal orders or demarcate clear dispersal routes, nor did they ensure that MPD Defendant Officers did so, as required by D.C.'s First Amendment Assemblies Act ("FAAA").[41]

89.    When MPD and USCP arrived on scene, the protesters were simply singing, chanting, and projecting messages regarding the sanctity of human life. They were not blocking walkways, damaging property, or violating any laws.

90.    MPD and USCP do not always resort to clearing protests violently, and appear to be influenced and driven by the content of the speech at hand.[42] In a 2022 report, the Council compared MPD's peaceful escort of masked white supremacy protesters[43] to MPD's decisions to arrest, use chemical weapons on, and remove the medical masks of racial justice protesters during the height of the Covid-19 pandemic

---

[41]  D.C. Code § 5-331.07(e).

[42]  Report on Bill 24-0320, "Comprehensive Policing and Justice Reform Amendment Act of 2022," Councilmember Charles Allen (Nov. 30, 2022), at 36–38, https://bit.ly/3AuBbqM.

[43]  *Masked White Nationalists March in Washington with Police Escort*, Reuters (Feb. 8, 2020), https://reut.rs/3AfCWIk.

in 2020.[44] The Council noted that "the use of riot gear, less-lethal weapons, and kettling tactics," in response to protests for racial justice during the summer of 2020, compared to the police response to the insurrection at the U.S. Capitol on January 6, 2021," raised "concerns about how bias affects the manner in which MPD polices First Amendment Assemblies."[45]

91.     Indeed, several months after the November 15 protest, MPD supervisors specifically declined to disperse a Gaza solidarity student encampment at George Washington University because it was "peaceful."[46] That is, until they succumbed to political pressure from House Republicans, ultimately clearing the encampment hours before Mayor Bowser was required to appear at a congressional hearing focused on MPD's decision not to clear it.[47]

---

[44] *Protest During Pandemic: D.C. Police Kettling of Racial Justice Demonstrators on Swann Street*, ACLU of the District of Columbia, Washington Lawyers' Committee for Civil Rights and Urban Affairs & Sidley Austin LLP (Mar. 9, 2021), https://bit.ly/3AksXl3.

[45] *Supra* n.30.

[46] *See* Peter Hermann, *D.C. police rejected GWU's plea to sweep out university protesters*, The Washington Post (Apr. 27, 2024) ("Officers had assembled around 3 a.m. Friday and were prepared to enter the encampment, but senior leaders in the police chief's and mayor's office ordered them to stand down, the officials said."), https://wapo.st/3SIGuZW.

[47] Justin Papp, *Comer cancels oversight hearing after clearing of GW encampment*, Roll Call (May 8, 2024) ("I am pleased that the potential Oversight hearing led to swift action by Mayor Bowser and MPD Chief [Pamela] Smith."), https://bit.ly/4fUAHuD.

92.     In this instance, Defendant Jason Bagshaw and the remaining Supervising MPD and USCP Defendants appear to have ordered a violent dispersal of the protest because of the content of Plaintiffs' and other protesters' speech.

93.     On information and belief, Defendant Jason Bagshaw and other Supervising MPD and USCP Defendant Officers formulated a plan to disrupt the protest with brute force, pre-authorizing lower-ranking Defendant Officers to behave violently without provocation and to arrive at the protest in riot gear, when less violent options were available to them.

## IV.     Impact of the Police Brutality

94.     In total, MPD and USCP officers injured approximately 90 people, including all of the Plaintiffs. They caused chemical burns, bone injuries, bruising and bleeding, puncture wounds and lacerations, concussions, hair loss, and psychological injuries.

95.     Many protesters, including all of the Plaintiffs, were traumatized and scarred by the officers' brutality, which chilled their participation in First Amendment activities for weeks or months after the protest.

96.      To justify USCP Defendant Officers' behavior, USCP claimed that protesters "pepper sprayed [their] officers" in their official statement.[48] Congressman Brad Sherman echoed this claim.[49]

---

[48] *See* Press Release, *USCP Statement on the Unlawful Demonstration Outside the DNC*, United States Capitol Police (Nov. 16, 2023), https://bit.ly/3SMQkdy.

[49] Congressman Brad Sherman (@BradSherman), X (Nov. 15, 2023, 8:55 PM), https://bit.ly/4dryOUA.

97.     In reality, only the police used chemical weapons that night, and they did so in such an indiscriminate and reckless manner that their own officers were harmed. Only one protester was arrested and charged with any offense that evening—further substantiating that protesters did nothing to provoke or justify this level of police violence. None of the Plaintiffs were ever arrested or charged with any crime.

**V.    Plaintiffs' Experiences at the Protest**

98.     Each of the Plaintiffs was at the November 15, 2023 vigil and protest outside the DNC building. In violently dispersing the protest without provocation, MPD and USCP Defendant Officers violated Plaintiffs' rights under federal and D.C. law.

99.     None of the Plaintiffs entered or attempted to enter the DNC building or prevented people from entering or leaving the building.

100.    Plaintiffs were not threatening, harassing, or attempting to threaten or harass anyone.

101.    Plaintiffs did not destroy or attempt to destroy any property. They did not cause or attempt to cause any physical harm.

102.    Neither MPD nor USCP charged any Plaintiff with any crimes for their activities at the protest. No police force formally arrested any Plaintiff at the protest.

103.    Without giving a warning, a general order to disperse, a dispersal route, or a statement that Plaintiffs were breaking the law in any way, MPD and USCP

Defendant Officers violently and abruptly attacked each of the Plaintiffs, as detailed below.

104.    Supervising MPD and USCP Defendant Officers directed, permitted, and participated in the egregious violence used to disperse the November 15, 2023 protest.

**A. Sam Rise (they/them)**

105.    On November 15, 2023, Sam was outside the DNC headquarters to "protest the use of United States tax dollars and weaponry to aid and abet Israel's genocide in Gaza." As a former delegate, canvasser, and organizer for the DNC, Sam knows how important it is for lawmakers to hear directly from their constituents.

106.    Before the demonstration, Sam spent hours hot-gluing thousands of electric candles to a banner, to commemorate the lives of the 11,000 Palestinians killed by the Israeli military since October 7, 2023.

107.    Sam wore a kefiyyeh around their neck to symbolize their support of Palestinian life and liberation. They also wore a t-shirt that read "Ceasefire Now!"

108.    At the protest, Sam was chanting and singing in support of a ceasefire in Gaza. Sam led fellow protesters in chants like "Ceasefire now," "Let Gaza live," and "Not another nickel, not another dime, no more money for Israel's crimes" while holding a banner that read, "Ceasefire."

109.    First, MPD or USCP Defendant Officers snatched Sam's ceasefire banner away while they were chanting and singing.

110.    An MPD or USCP Defendant Officer yanked on the kefiyyeh Sam wore around their neck, choking Sam, restricting their breathing, and physically and symbolically suppressing their speech.

111.    MPD or USCP Defendant Officers pushed Sam against the glass of the DNC headquarters, restricting their movement.

112.    Sam is a mixed race Black gender-nonconforming person who wore their natural hair out in a gray Afro. MPD or USCP Defendant Officers grabbed Sam by their hair and yanked chunks of hair out of their head.

113.    MPD or USCP Defendant Officers grabbed Sam by their right arm and twisted it back behind their shoulder at a painful and unnatural angle.

114.    Multiple times, MPD or USCP Defendant Officers lifted Sam off their feet, pulling Sam's arms behind them in a painful position.

115.    MPD or USCP Defendant Officers kicked Sam's feet out from under them, causing them to fall to the ground.

116.    MPD or USCP Defendant Officers knocked Sam to the ground repeatedly by pushing them and pushing other protesters into Sam.

117.    MPD or USCP Defendant Officers knocked Sam's glasses off their face, mangling them.

118.    MPD or USCP Defendant Officers dragged Sam to the stairs and violently forced them down the steps.

119.    MPD or USCP Defendant Officers then pinned Sam between a metal barricade and an unmarked squad car, while shouting "move!"

31

120.   MPD or USCP Defendant Officers pushed the metal barricade down onto Sam's foot with their full body weight, breaking through Sam's leather boot and injuring their foot.

121.   It was physically impossible for Sam to comply with an order to "move" because the MPD or USCP Defendant Officers were restricting Sam's movement.

122.   Sam told the MPD or USCP Defendant Officers that they could not breathe.

123.   Sam told the MPD or USCP Defendant Officers that they could not move.

124.   Sam struggled to free their foot from the metal barricade until fellow protesters helped lift it off.

125.   An MPD or USCP Defendant Officer then hit Sam in the back of their head with a tear gas canister.

126.   MPD or USCP Defendant Officers deployed tear gas immediately in front of where Sam stood, releasing a mist of carcinogenic chemical irritants.

127.   After MPD or USCP Defendant Officers tear gassed them, Sam immediately began coughing and retching, to the point of vomiting. They struggled to see and to breathe, because of the tear gas. The chemicals stuck to Sam's clothes, so when fellow protesters helped Sam douse their eyes with water to flush the chemicals out, Sam's skin became inflamed and irritated as well.

128.   Although Defendant Jason Bagshaw and Supervising MPD Defendant Officers were on the scene, they did not give a clear dispersal order or dispersal route,

nor did they ensure that MPD Defendant Officers did so, before MPD Defendant Officers inflicted violence on Sam.

129.    At no point did Defendant Jason Bagshaw or any Supervising MPD Defendant Officer intervene or instruct MPD Defendant Officers, who were inflicting physical violence on Sam and other protesters, to halt the violence. Instead, Defendant Bagshaw and Supervising MPD Defendant Officers walked through the crowds and stood back as MPD Defendant Officers inflicted gratuitous and unprovoked violence.

130.    Likewise, at no point did any Supervising USCP Defendant Officer intervene or instruct USCP Defendant Officers, who were inflicting physical violence on Sam and other protesters, to halt the violence. Instead, Supervising USCP Defendant Officers walked through the crowds and stood back as USCP Defendant Officers inflicted gratuitous and unprovoked violence.

131.    Due to MPD and USCP Defendant Officers' violence at the protest, Sam suffered physical and psychological injuries.

132.    Sam's neck was tender for days afterwards. They experienced a lot of pain the first couple of days and the soreness persisted for the better part of a week.

133.    Sam's head was tender and sore for days after the protest. When they showered immediately upon arriving home, clumps of their hair fell out because the police had pulled on it so hard.

134.    Sam suffered respiratory pain and irritation due to the tear gas. Their eyes, nose, and throat felt raw and inflamed for several days.

33

135.    The skin on Sam's face, neck, chest, and arms was raw and inflamed for several days.

136.    For about a week, Sam's body ached all over from being repeatedly thrown to the ground and assaulted by Defendant Officers.

137.    Sam suffered a twisted wrist and severe pain in their right shoulder where Defendant Officers wrenched Sam's arm behind their back. This included acute pain for several days, followed by lingering soreness. It took several weeks for Sam's shoulder to fully heal.

138.    Approximately a month after the protest, Sam was treated for lower back pain. They had been experiencing limited mobility, acute pain and pressure along their spine, and inflammation.

139.    Soon after, Sam was diagnosed with a lower back injury, specifically to their L5/S1 disc.

140.    The MPD and USCP Defendant Officers' violence caused Sam severe emotional trauma and turmoil, which they are still processing. Though Sam continues to organize and protest, they are now hypervigilant when they attend direct actions. Public spaces of grief and mourning of Palestinian life are now infected with a fear and memory of police brutality.

141.    Sam was horrified by the brutality they saw and experienced at the hands of MPD and USCP Defendant Officers.

142.    Sam believes this violence was intended to punish them for exercising their First Amendment rights in support of Palestinian life and liberation, and for calling out the United States' complicity in Israel's mass killings in Gaza.

**B. Tamar June (she/her)**

143.    At the protest, Tamar wore a kefiyyeh around her neck to symbolize her support of Palestinian life and liberation. She also wore a t-shirt that read "Ceasefire Now!"

144.    Tamar was standing on the steps in front of the DNC building, not blocking the entrance. MPD or USCP Defendant Officers grabbed Tamar and yanked her, along with 10–12 other protesters, down the stairs of the DNC headquarters.

145.    MPD or USCP Defendant Officers pushed Tamar into the crowd.

146.    An MPD or USCP Defendant Officer lifted a metal barricade and slammed it down onto Tamar's foot multiple times. She felt like they were trying to tear off her ankle.

147.    The officer then stomped on the barricade with his own foot, crushing Tamar's foot underneath as she cried out in pain.

148.    Tamar made eye contact with the MPD or USCP Defendant Officer as she was screaming. He looked directly at her and continued to pummel her foot. Despite the fact that Tamar was squashed between other protesters and had nowhere to go, the officer yelled at her to, "Get back!" as he was assaulting her.

149.    Tamar's fellow protesters eventually pushed against the barricade to free Tamar's foot.

150.    The police violence continued. MPD or USCP Defendant Officers pushed Tamar and other protesters against a barricade and a fence with nowhere they could physically move.

151.    At this point, an MPD or USCP Defendant Officer grabbed the kefiyyeh Tamar wore around her neck, choking her, restricting her breathing, and physically and symbolically suppressing her speech.

152.    Tamar tried to scream for help but could not get any words out because her neck was so constricted.

153.    A fellow protester helped unwind Tamar's kefiyyeh to free her from the officer's life-threatening grip on her neck.

154.    Tamar heard a shot and saw a tear gas explosion, and she unwittingly inhaled the carcinogenic chemical irritant.

155.    The tear gas created a mist that temporarily obstructed Tamar's view. As soon as the mist cleared, she saw an MPD or USCP Defendant Officer pepper spray Plaintiff Noelle Gorman directly in the face.

156.    Although Defendant Jason Bagshaw and Supervising MPD Defendant Officers were on the scene, they did not give a clear dispersal order or dispersal route, nor did they ensure that MPD Defendant Officers did so, before MPD Defendant Officers inflicted violence on Tamar.

157.    At no point did Defendant Jason Bagshaw or any Supervising MPD Defendant Officer intervene or instruct MPD Defendant Officers, who were inflicting physical violence on Tamar and other protesters, to halt the violence. Instead,

Defendant Bagshaw and Supervising MPD Defendant Officers walked through the crowds and stood back as MPD Defendant Officers inflicted gratuitous and unprovoked violence.

158.    Likewise, at no point did any Supervising USCP Defendant Officer intervene or instruct USCP Defendant Officers, who were inflicting physical violence on Tamar and other protesters, to halt the violence. Instead, Supervising USCP Defendant Officers walked through the crowds and stood back as USCP Defendant Officers inflicted gratuitous and unprovoked violence.

159.    MPD or USCP Defendant Officers inflicted physical and psychological injuries on Tamar that lasted well beyond the protest.

160.    Tamar's foot was very bruised where an MPD or USCP Defendant Officer slammed a metal barricade down onto her. Tamar struggled to put any weight on that foot for at least a week and it continued to swell for long afterwards.

161.    Tamar's neck was tender and painful to the touch from being strangled with her kefiyyeh. It hurt even when Tamar's own clothing simply grazed her neck.

162.    Tamar's legs were sore and bruised from being thrown around and pushed against barricades and a fence by MPD or USCP Defendant Officers.

163.    Tamar had difficulty breathing after the protest. She does not know whether this was because of the MPD or USCP Defendant Officer who strangled her or the MPD or USCP Defendant Officer who deployed tear gas in her vicinity.

164.    Tamar felt shaky and on edge because of the brutality she suffered at the hands of MPD or USCP Defendant Officers. When Tamar's fiancé, whom she loves

and trusts, did so much as place his arm on her shoulder, it caused her to shudder. Based on her experience as a psychotherapist, Tamar recognized this as a lingering sign of psychological trauma from the strangulation.

165.    In the days after the protest, Tamar sought care from a mental health counselor to process her trauma, and from a physical therapist and two acupuncturists to treat her physical injuries.

### C. Sonalee Rashatwar (they/he)

166.    At the protest, Sonalee wore a "Ceasefire Now" t-shirt while singing and chanting for a ceasefire near the chain link fence on Ivy Street.

167.    Boot-clad MPD or USCP Defendant Officers stomped on Sonalee's sandaled feet, causing Sonalee's toenails to lift and bleed and causing Sonalee extreme pain.

168.    An MPD or USCP Defendant Officer sexually assaulted Sonalee by intentionally and forcefully groping Sonalee's breasts before pushing them to the ground.

169.    MPD or USCP Defendant Officers pushed Sonalee to the ground multiple times and used their bikes to trap Sonalee against a parked car, causing bruising and pain to Sonalee's back and bottom.

170.    Sonalee continuously yelled "Please stop!" and "I'm a peaceful protester!" while MPD or USCP Defendant Officers enacted violence on their body.

171.    After being pushed, Sonalee heard a bursting sound and then heard someone say they had something in their eye. Sonalee concluded the officers had

deployed tear gas. At that point, Sonalee moved away from the DNC towards South Capitol Street.

172.    Although Defendant Jason Bagshaw and Supervising MPD Defendant Officers were on the scene, they did not give a clear dispersal order or dispersal route, nor did they ensure that MPD Defendant Officers did so, before MPD Defendant Officers inflicted violence on Sonalee.

173.    At no point did Defendant Jason Bagshaw or any Supervising MPD Defendant Officer intervene or instruct MPD Defendant Officers, who were inflicting physical violence on Sonalee and other protesters, to halt the violence. Instead, Defendant Bagshaw and Supervising MPD Defendant Officers walked through the crowds and stood back as MPD Defendant Officers inflicted gratuitous and unprovoked violence.

174.    Likewise, at no point did any Supervising USCP Defendant Officer intervene or instruct USCP Defendant Officers, who were inflicting physical violence on Sonalee and other protesters, to halt the violence. Instead, Supervising USCP Defendant Officers walked through the crowds and stood back as USCP Defendant Officers inflicted gratuitous and unprovoked violence.

175.    In addition to the physical injuries and pain that MPD or USCP Defendant Officers inflicted upon Sonalee, their violence caused Sonalee to experience anxiety, depression, and sleeplessness.

176.    Sonalee declined to attend future protests because of MPD or USCP Defendant Officers sexual and physical violence against him. MPD or USCP

Defendant Officers' violence against Sonalee caused him to feel scared that police would suddenly enact violence on him and other protesters in the future.

**D. Alden Dirks (they/them)**

177.    At the protest, Alden wore a "Ceasefire Now" t-shirt while singing and chanting for a ceasefire on the front steps of the DNC headquarters.

178.    Without warning, an MPD or USCP Defendant Officer sprayed a chemical agent at Alden, who was just chanting and singing, causing one of Alden's eyes to burn intensely, so much so that they struggled to open it. The extreme burning sensation made Alden disoriented and obstructed their vision.

179.    MPD or USCP Defendant Officers repeatedly shoved the protesters in front of Alden, making it difficult for Alden to stay on their feet.

180.    Alden, who still could not see because of the chemical agent in their eyes, reflexively tried to stabilize themselves by grabbing a door handle while multiple Defendant Officers simultaneously attacked Alden.

181.    An MPD or USCP Defendant Officer restricted Alden's breathing by grabbing Alden's neck and pushing their thumb into Alden's windpipe, and strangling them, causing pain and bruising.

182.    Simultaneously, an MPD or USCP Defendant Officer pulled Alden forward and down toward the ground with such force that the officer shredded Alden's "Ceasefire Now" t-shirt.[50]  To Alden, it felt like the officer was trying to rip the shirt

---

[50] Alden Dirks took this photograph after the protest, to document how the police tore his t-shirt.

off their body. The officer's rage was palpable to Alden.



183. An MPD or USCP Defendant Officer punched Alden's arm quickly and repeatedly to make Alden let go of the door handle that they reflexively grabbed. Alden let go of the door handle as a result. The police's punching caused pain in Alden's wrist.

184. Defendant Officers shoved Alden and other protesters down the stairs. Officers kept pushing Alden until they were on Ivy Street. An officer shoved Alden against a car.

185. Suddenly and without warning, Alden heard a very loud bang and saw

41

a very bright light. A Defendant Officer had thrown a flash bang grenade in Alden's immediate vicinity.

186.    Given that Alden and their fellow protesters were not causing any harm and were prepared to leave if the police ordered them to disperse, Alden perceived Defendant Officers' brute and unprovoked show of force to be a direct response to the subject of their protest—Democratic lawmakers' indifference toward Palestinian life and suffering.

187.    Alden watched as MPD or USCP Defendant Officers destroyed their fellow protesters' candlelight vigil symbolizing Palestinian lives stolen. Because the vigil was one of many symbols of Alden's speech in support of a ceasefire, Alden felt that the Defendant Officers' intentional destruction of the vigil targeted the content of Alden's verbal and symbolic speech.

188.    Although Defendant Jason Bagshaw and Supervising MPD Defendant Officers were on the scene, they did not give a clear dispersal order or dispersal route, nor did they ensure that MPD Defendant Officers did so, before MPD Defendant Officers inflicted violence on Alden.

189.    At no point did Defendant Jason Bagshaw or any Supervising MPD Defendant Officer intervene or instruct MPD Defendant Officers, who were inflicting physical violence on Alden and other protesters, to halt the violence. Instead, Defendant Bagshaw and Supervising MPD Defendant Officers walked through the crowds and stood back as MPD Defendant Officers inflicted gratuitous and unprovoked violence.

42

190.    Likewise, at no point did any Supervising USCP Defendant Officer intervene or instruct USCP Defendant Officers, who were inflicting physical violence on Alden and other protesters, to halt the violence. Instead, Supervising USCP Defendant Officers walked through the crowds and stood back as USCP Defendant Officers inflicted gratuitous and unprovoked violence.

191.    Because of the MPD and USCP Defendant Officers' violence at the protest, Alden feels increased anxiety and apprehension about protesting and critiquing the government. Alden worries that police will suddenly and unjustifiably inflict violence on protesters in the future. As Alden has continued to attend protests in support of Palestinian life, they feel markedly anxious when they witness the militarized police presence at these demonstrations.

192.    Because of Alden's anxiety about future police violence against protesters, Alden completed medical training to learn how to treat injuries from chemical agents.

**E. Veronica Mosqueda (she/her)**

193.    At the protest, Veronica wore a "Ceasefire Now" t-shirt while singing and chanting for a ceasefire on the steps of the DNC headquarters.

194.    As Veronica sang and chanted, she watched as Defendant Officers shoved metal barricades into the crowd of protesters and forced protesters back.

195.    Soon after, an MPD or USCP Defendant Officer restricted Veronica's breathing by grabbing Veronica's neck and strangling her while pushing her backwards.

43

196.    An MPD or USCP Defendant Officer forcefully pushed Veronica to the ground, causing her knees to slam into the concrete.

197.    An MPD or USCP Defendant Officer then picked Veronica up by her backpack and threw her to the ground, causing her body to slam into the concrete again.

198.    When a fellow protester asked the MPD or USCP officers to stop harming the protesters, Veronica heard an officer respond, "We'll get away with it," which caused her to fear further police violence in retaliation for her speech.

199.    Veronica watched as MPD or USCP Defendant Officers destroyed her fellow protesters' candlelight vigil symbolizing 11,000 Palestinian lives stolen. Because the vigil was one of many symbols of Veronica's speech in support of a ceasefire, Veronica felt that the officers' intentional destruction of the vigil was designed to censor her verbal and symbolic speech.

200.    More MPD or USCP Defendant Officers arrived with riot gear, gas masks, shields, and body armor. Based on this militarized presence, Veronica feared that the officers were going to harm her and her fellow protesters, including by bashing their heads in. Veronica feared that Defendant Officers would permanently physically disable her friends.

201.    Veronica saw MPD or USCP Defendant Officers deploy tear gas a few yards away from where she stood. She feared this would cause her a severe asthma attack.

202.   Although Defendant Jason Bagshaw and Supervising MPD Defendant Officers were on the scene, they did not give a clear dispersal order or dispersal route, nor did they ensure that MPD Defendant Officers did so, before MPD Defendant Officers inflicted violence on Veronica.

203.   At no point did Defendant Jason Bagshaw or any Supervising MPD Defendant Officer intervene or instruct MPD Defendant Officers, who were inflicting physical violence on Veronica and other protesters, to halt the violence. Instead, Defendant Bagshaw and Supervising MPD Defendant Officers walked through the crowds and stood back as MPD Defendant Officers inflicted gratuitous and unprovoked violence.

204.   Likewise, at no point did any Supervising USCP Defendant Officer intervene or instruct USCP Defendant Officers, who were inflicting physical violence on Veronica and other protesters, to halt the violence. Instead, Supervising USCP Defendant Officers walked through the crowds and stood back as USCP Defendant Officers inflicted gratuitous and unprovoked violence.

205.   Because of the physical violence MPD or USCP Defendant Officers inflicted on Veronica, her neck was sore for two days after the protest. And Veronica's knee—which MPD or USCP Defendant Officers slammed into the concrete—ached deeply for about a month.

206.   In addition to the physical injuries that MPD or USCP Defendant Officers inflicted upon Veronica, Veronica also suffered extreme fear, anxiety, and

45

disembodiment as a result of Defendant Officers' violence. Her emotional distress was so severe that she sought therapy within days after the protest.

207.    Defendant Officers' violence against Veronica made her feel increased anxiety and apprehension about protesting, as she fears that police officers will suddenly inflict violence on her. She attended one protest in support of Palestinian life in December 2023 but felt increased anxiety while there. As a result, she abstained from any protests for several months.

208.    The lasting trauma Veronica experienced after the protest contributed to her decision, at her therapist's advice, to take medical leave from her job from January through March 2024. During this time, as Veronica processed her trauma, her mental health deteriorated. The first month in particular was extremely distressing and debilitating. MPD and USCP Defendant Officers' unprovoked brutality with Veronica and other protesters caused her to feel deeply unwell in the months after the protest.

**F. Sharmin Hossain (she/her)**

209.    At the protest, Sharmin stood at the top of the DNC's front steps. She was chanting, "Let Gaza Live," and "Ceasefire Now," and wearing a black and white "Ceasefire Now" t-shirt.

210.    An MPD or USCP Defendant Officer violently pulled Sharmin away and down the steps of the DNC building. Grabbing Sharmin by her hair, the officer shoved her against a nearby pillar.

211.    An MPD or USCP Defendant Officer then dragged Sharmin's body down and across concrete stairs, gridlocking her between the steps and a barricade. An MPD or USCP Defendant Officer pulled at Sharmin's arm with a lot of force. Though Sharmin did not resist and was physically trapped, the Defendant Officer body slammed Sharmin against a car. Sharmin tried to leave but there was no path out.

212.    An MPD or USCP Defendant Officer deployed a carcinogenic tear gas at close range to Plaintiff Sam Rise, who was right next to Sharmin, without warning or provocation. The chemical agent struck Sharmin, causing Sharmin extreme pain. She felt like she could not breathe and began coughing hard. She felt like she was going to vomit. Sharmin tried to move away so she could find a medic, but she was barricaded in by MPD or USCP Defendant Officers.

213.    At no point did any officer give Sharmin an order or path to move.

214.    Sharmin also bore witness to the excessive violence enacted against her fellow demonstrators. As Sharmin was thrown and dragged, she saw MPD or USCP Defendant Officers bring out bikes and slam them against protesters. Sharmin witnessed her friends being tackled, hit, and shoved with barricades.

215.    Although Defendant Jason Bagshaw and Supervising MPD Defendant Officers were on the scene, they did not give a clear dispersal order or dispersal route, nor did they ensure that MPD Defendant Officers did so, before MPD Defendant Officers inflicted violence on Sharmin.

216.    At no point did Defendant Jason Bagshaw or any Supervising MPD Defendant Officer intervene or instruct MPD Defendant Officers, who were inflicting

47

physical violence on Sharmin and other protesters, to halt the violence. Instead, Defendant Bagshaw and Supervising MPD Defendant Officers walked through the crowds and stood back as MPD Defendant Officers inflicted gratuitous and unprovoked violence.

217.    Likewise, at no point did any Supervising USCP Defendant Officer intervene or instruct USCP Defendant Officers, who were inflicting physical violence on Sharmin and other protesters, to halt the violence. Instead, Supervising USCP Defendant Officers walked through the crowds and stood back as USCP Defendant Officers inflicted gratuitous and unprovoked violence.

218.    In the days following the protest, Sharmin saw protesters being vilified on social media, called terrorists, and falsely accused of "kidnapping" individuals inside DNC headquarters.

219.    For weeks following the incident, Sharmin experienced physical soreness and severe mental distress. Sharmin was unable to fully rotate her shoulder for four days after the incident. Sharmin began acupuncture treatment to find relief for her pain.

220.    Sharmin took a two-day break from work and remained inside her home to help her recover from the violence and emotional trauma the MPD and USCP Defendant Officers inflicted at the November 15 protest. Sharmin felt unable to drive and feared seeing police in her community.

221.    Anxious about future police violence against protesters, Sharmin waited over two months to attend demonstrations where she might encounter police. Even

now, Sharmin remains fearful about the potential of experiencing police brutality while protesting.

### G. Treacy Gaffney (she/her)

222.   On November 15, 2023, Treacy was standing on the public sidewalk across from the DNC headquarters to "protest U.S. support for Israel's ongoing genocide in Gaza."

223.   Treacy was wearing a black-and-white "Ceasefire Now!" t-shirt and was chanting "Ceasefire Now."

224.   MPD or USCP Defendant Officers stormed over quickly and aggressively and shouted at the group Treacy was in to "get back!" but there was nowhere for her to move, as she was surrounded on all sides by police and fellow protesters.

225.   Within seconds, MPD or USCP Defendant Officers began ramming their bikes into Treacy and her fellow protesters while shoving and screaming at them.

226.   Without warning or provocation, one USCP Defendant Officer punched Treacy in the face with a closed fist, which was very painful and left a bruise. Within twenty seconds, when Treacy was still reeling from the shock of the punch, the same officer pepper sprayed Treacy in the face at close range (within two feet), again without warning or provocation. As the pepper spray began hitting Treacy's face, she instinctively turned her head to protect herself, and more of the spray went directly into her ear.



227.    This was painful and disorienting. Treacy struggled to breathe due to the reduced flow of oxygen caused by the pepper spray. Her eyes burned and she teared up to the point that she could not see clearly. Her ear hurt tremendously, and she lost hearing in that ear for the rest of the evening.

228.    Treacy moved away from the protest and into the parking lot across the street so she could recover. Other protesters helped Treacy by pouring water into her eyes. She thought she would be safe there but, soon enough, Defendant Officers began charging at people in the parking lot, causing Treacy to flee in fear. She was extremely shaken up by the Defendant Officers' violence.

229.    Although Defendant Jason Bagshaw and Supervising MPD Defendant Officers were on the scene, they did not give a clear dispersal order or dispersal route, nor did they ensure that MPD Defendant Officers did so, before MPD Defendant Officers inflicted violence on Treacy.

230.    At no point did Defendant Jason Bagshaw or any Supervising MPD Defendant Officer intervene or instruct MPD Defendant Officers, who were inflicting physical violence on Treacy and other protesters, to halt the violence. Instead, Defendant Bagshaw and Supervising MPD Defendant Officers walked through the crowds and stood back as MPD Defendant Officers inflicted gratuitous and unprovoked violence.

231.    Likewise, at no point did any Supervising USCP Defendant Officer intervene or instruct USCP Defendant Officers, who were inflicting physical violence on Treacy and other protesters, to halt the violence. Instead, Supervising USCP Defendant Officers walked through the crowds and stood back as USCP Defendant Officers inflicted gratuitous and unprovoked violence.

232.    Treacy suffered physical and psychological injuries that lasted well beyond the protest. She suffered pain from the close-range and prolonged shot of chemical agent into her ear and lost hearing for the evening. When Treacy showered after she got home, the chemical agent in her hair and on her face reactivated, causing the burning sensation to erupt all over again. Treacy's face was bruised where the USCP Defendant officer punched her.

51

233.    Because of MPD and USCP Defendant Officers' violence at the protest, Treacy limited her participation in protests in support of Palestinian life for about several months. This was frustrating to Treacy, because of the urgency of demonstrating mass support for a ceasefire to the political leaders funding mass atrocities in Palestine. Treacy continues to fear police violence at protests and is hypervigilant for police aggression at any protest she ends.

### H. Noelle Gorman (she/her)

234.    At the protest, Noelle was standing on the sidewalk in front of the parking lot on Ivy Street, across the street from the DNC headquarters front steps.

235.    Earlier in the evening, Noelle had helped prepare a candlelight vigil. When Noelle arrived at the DNC building, the candlelight vigil had been set up to represent 11,000 Palestinian lives lost to the Israeli military's violence in Gaza.

236.    She protested by verbally demanding a ceasefire, wearing a "Ceasefire Now" t-shirt.

237.    Two MPD or USCP Defendant Officers approached Noelle and shoved her back with a metal barricade toward the parking lot fence. One of these officers ordered Noelle to "get on the fucking sidewalk," even though she was already on the sidewalk.

238.    Noelle watched as MPD or USCP Defendant Officers destroyed the candlelight vigil that she helped prepare to commemorate Palestinian lives. Noelle felt that the MPD or USCP Defendant Officers' intentional destruction of the vigil targeted the content of Noelle's verbal and symbolic speech in support of a ceasefire.

52

239. Within seconds of making this nonsensical command, the same Defendant Officer stood directly in front of Noelle and sprayed a chemical agent directly into her eyes, from a mere inch away. The officer gave no warning.

240. Noelle experienced the worst pain she has ever felt. Noelle experienced extreme burning sensations in her eyes, on her skin, and in her nose and throat as a result of the MPD or USCP Defendant Officer's violence against her. Noelle felt like she couldn't breathe and like her face was on fire.

241. Noelle immediately fell backwards to the ground and screamed for a medic. Noelle was disoriented by the pain and could not see what was happening around her. She could feel people grabbing her arms and dragging her away from the crowd.

242. A medic told Noelle to tilt her head and open her eyes, but she could not do so because the pain was so intense. The medic eventually started pouring water in Noelle's eyes. It took fifteen to twenty minutes of rinsing Noelle's eyes and face for the pain to subside and for her to calm down. Her eyes were red and swollen.

243. Although Defendant Jason Bagshaw and Supervising MPD Defendant Officers were on the scene, they did not give a clear dispersal order or dispersal route, nor did they ensure that MPD Defendant Officers did so, before MPD Defendant Officers inflicted violence on Noelle.

244. At no point did Defendant Jason Bagshaw or any Supervising MPD Defendant Officer intervene or instruct MPD Defendant Officers, who were inflicting physical violence on Noelle and other protesters, to halt the violence. Instead,

53

Defendant Bagshaw and Supervising MPD Defendant Officers walked through the crowds and stood back as MPD Defendant Officers inflicted gratuitous and unprovoked violence.

245.    Likewise, at no point did any Supervising USCP Defendant Officer intervene or instruct USCP Defendant Officers, who were inflicting physical violence on Noelle and other protesters, to halt the violence. Instead, Supervising USCP Defendant Officers walked through the crowds and stood back as USCP Defendant Officers inflicted gratuitous and unprovoked violence.

246.    When Noelle got home and showered, the residue of the chemical agent still on her skin re-vaporized and stung her eyes and skin again. It was difficult for Noelle to fall asleep because her eyes were still stinging from the chemical agent.

247.    The MPD or USCP Defendant Officers' violence against Noelle made her feel increased anxiety and apprehension about protesting. She worries that police will suddenly enact violence on her or other protesters in the future. Noelle now feels that, when it comes to protests in support of Palestinian life, the police's response and the violence they will inflict is unpredictable.

248.    For instance, Noelle attended another protest for Palestine in December 2023, focused on demanding that Congress halt U.S. weapons transfers to Israel. But Noelle was apprehensive throughout because of the MPD or USCP Defendant Officers' intense and unprovoked violence on November 15.

## I. Beth Gen (they/them)

249.   At the protest, Beth wore a "Ceasefire Now" t-shirt while singing and chanting for a ceasefire on the steps of the DNC headquarters, by the front door.

250.   As Beth sang and chanted, several USCP Defendant Officers pulled Beth's arms and torso in different directions for an extended period, causing intense pain to Beth's arms and neck.

251.   These USCP Defendant Officers next slammed Beth into another protester, and slammed both protesters into a wall. They did so without issuing any warnings or orders to leave.

252.   A USCP Defendant Officer then grabbed Beth's arm and dragged them over another protester. Beth fell to the ground and curled into a fetal position, fearing they would be trampled. USCP officers ordered Beth to get up, but before Beth had a chance to comply, a USCP Defendant Officer dragged Beth down the concrete steps of the DNC building.

253.   At the base of the steps, Beth regained their footing and stood up, but the USCP Defendant Officer who dragged Beth down the steps continued to hold onto them. The officer instructed Beth to put their arms behind their back, which Beth did. The USCP Defendant Officer then held Beth's arms together behind their back and escorted Beth down the block, on Ivy Street toward South Capitol Street.

254.   Beth asked if they were being arrested, but the officer did not respond.

255.   Once Beth and the USCP Defendant Officer reached the end of the block, the officer asked Beth multiple times if Beth had touched another officer. Beth

responded that they had not touched any officers. Beth was confused as to whether they were being arrested because the USCP Defendant Officer refused to answer Beth's question about this. The officer eventually released Beth.

256.    Beth was concerned for their own safety and for the safety of the protesters around them being assaulted by MPD and USCP Defendant Officers. Beth stood in the parking lot on Ivy Street to watch what the officers were doing to protesters. Beth saw Defendant Officers pepper spray protesters, so Beth tried to help them rinse their eyes. As a result, Beth got chemical residue on their hands, which burned Beth's skin.

257.    Likewise, at no point did any Supervising USCP Defendant Officer intervene or instruct USCP Defendant Officers, who were inflicting physical violence on Beth and other protesters, to halt the violence. Instead, Supervising USCP Defendant Officers walked through the crowds and stood back as USCP Defendant Officers inflicted gratuitous and unprovoked violence.

258.    In addition to the physical pain that USCP Defendant Officers inflicted on Beth, their violence caused Beth to feel anxiety and fear. They found USCP Defendant Officers violence to be shocking and traumatic. For about a week following the protest, Beth had a hard time sleeping. They also had a hard time focusing on their graduate studies.

259.    USCP Defendant Officers' violence against Beth made them feel increased anxiety and apprehension about protesting. They worry that police will

suddenly enact violence on them or other protesters in the future, and that this would trigger a trauma response

## CLAIMS FOR RELIEF

260. The following claims for relief are brought against Defendant Jason Bagshaw, Supervising MPD Defendant Officers, MPD Defendant Officers, Supervising USCP Defendant Officers, and USCP Defendant Officers for violating Plaintiffs' rights under federal and state law.

261. Defendant Jason Bagshaw, Supervising MPD Defendant Officers, and MPD Defendant Officers are liable for violating Plaintiffs' federal constitutional rights under the Ku Klux Klan Act, 42 U.S.C. § 1983. These Defendants are also liable for committing D.C. torts against Plaintiffs.

262. Defendant Jason Bagshaw, Supervising MPD Defendant Officers, and MPD Defendant Officers are liable for failing to fulfill duties set forth by the District of Columbia's First Amendment Assemblies Act ("FAAA"), D.C. Code § 5-331.07(e).

263. Supervising USCP Defendant Officers and USCP Defendant Officers are liable under the Ku Klux Klan Act, 42 U.S.C. § 1983, for violating Plaintiffs' federal constitutional rights because, at all times relevant, they were acting within MPD's jurisdictional boundaries and in accordance with an unlawful civil conspiracy with MPD Defendant Officers under the color of state law.

264. USCP Defendant Officers are liable under the Westfall Act, 28 U.S.C. § 2679(b)(2)(A), for violating Plaintiffs' constitutional rights through the commission of D.C. torts against Plaintiffs.

## Count I: Fourth Amendment Excessive and Unreasonable Force
### 42 U.S.C. § 1983
*On Behalf of All Plaintiffs*
*Against All MPD and USCP Defendants*
*for Declaratory Relief and Money Damages*

265.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1–259 above.

266.    Plaintiffs have a clearly established right under the Fourth Amendment to be free from the unreasonable and excessive use of force.

267.    John Doe MPD and USCP Defendant Officers subjected Plaintiffs to excessive and unreasonable force, causing both physical injuries and emotional anguish.

268.    MPD or USCP Defendant Officers used Plaintiffs Sam Rise and Tamar June's kefiyyehs—which they wore to express their support for Palestinian life and liberation—as weapons against them, choking them with their kefiyyehs, restricting their breathing, physically and symbolically suppressing their speech, and restricting their movement. MPD or USCP Defendant Officers strangled Plaintiffs Alden Dirks and Veronica Mosqueda with their bare hands. Plaintiffs subjected to these illegal neck restraints feared for their lives and suffered from long-lasting emotional anguish. They suffered serious physical injuries, including difficulty breathing even after the protest, as well as bruising, pain, and soreness on their necks and throats.

269.    MPD or USCP Defendant Officers indiscriminately subjected Plaintiffs Alden Dirks, Sam Rise, Sharmin Hossain, and Noelle Gorman to chemical weapons, including pepper spray and tear gas, without an adequate dispersal order or other

warning. MPD or USCP Defendant Officers deployed chemical weapons directly into Plaintiffs Noelle Gorman's and Treacy Gaffney's faces, at point blank range, and in the vicinity of Plaintiffs Sam Rise, Alden Dirks, and Sharmin Hossain. This made it difficult for Plaintiffs to breathe; caused Plaintiffs' eyes to water, obstructing their vision; and caused Plaintiffs to cough, retch, and, in the case of Plaintiff Sam Rise, to vomit. Plaintiffs' eyes, noses, and throats were raw and inflamed for days after the protest. The chemical weapons also caused severe irritation to Plaintiffs' skin, leading to days-long inflammation of Plaintiffs' chests, face, arms, and neck areas.

270.   An MPD or USCP Defendant Officer threw a flash bang grenade into the crowd on the sidewalk, at very close range to a large group of people, including Plaintiff Alden Dirks.

271.   MPD or USCP Defendant Officers pushed metal barricades and police boots down onto Plaintiffs Sam Rise's, Sonalee Rashatwar's and Tamar June's feet and refused to remove them, even as they cried out in pain. Plaintiffs suffered puncture wounds, lifted toenails, bruising, and swelling as a result.

272.   MPD or USCP Defendant Officers struck Plaintiff Sam Rise in the back of the head with a tear gas canister and yanked on their gray Afro, causing chunks of hair to fall out of their head when they showered after the protest. Sam's scalp was sore and tender to the touch as a result.

273.   MPD or USCP Defendant Officers shoved, dragged, threw, and body slammed Plaintiffs Sam Rise, Tamar June, Sonalee Rashatwar, Alden Dirks, Veronica Mosqueda, Sharmin Hossain, Treacy Gaffney, and Beth Gen, treating their

59

bodies as disposable. This caused Plaintiffs body aches and soreness for days or weeks after the protest. Sharmin was unable to fully rotate her shoulder for four days after the incident. Sam suffered a spinal injury.

274.   A USCP Defendant Officer punched Plaintiff Treacy Gaffney in the face with a closed fist, causing her pain and bruising.

275.   MPD or USCP Defendant Officers rammed their bicycles into Plaintiff Sonalee Rashatwar's body, causing bruising and pain to Sonalee's back and buttocks.

276.   An MPD or USCP Defendant Officer sexually assaulted Sonalee Rashatwar by groping Sonalee's breasts before pushing them to the ground and using their bikes to trap them against a parked car. This caused bruising and pain to Sonalee's back and bottom.

277.   The MPD and USCP Defendant Officers' violence caused Plaintiffs physical injuries including bleeding, bruising, and swelling, and muscle, bone, and nerve pain.

278.   Plaintiffs Sam Rise, Tamar June, Veronica Mosqueda, and Sharmin Hossain required medical treatment or mental health care in the days or weeks after the protest to address the injuries that Defendant Officers inflicted on them.

279.   All Plaintiffs suffered severe and lasting emotional distress due to MPD and USCP Defendant Officers' violence at the protest. For instance, as a result of the strangulation Defendant Officer inflicted on her, Tamar experienced a trauma response when her fiancé placed his arm on her shoulder. And the trauma caused by Defendant Officers' brutality led Veronica to take prolonged medical leave from work.

280.    Plaintiffs were protesting peacefully, including by chanting and singing, and attending a candlelight vigil.

281.    MPD and USCP Defendant Officers did not give a warning, a general order to disperse, a dispersal route, or a statement that Plaintiffs were violating the law in any way before resorting to excessive, unreasonable, and overwhelming force.

282.    No reasonable officer could conclude that Defendant Officers' physical violence, use of chemical weapons, and sexual assault were necessary where Plaintiffs were peacefully exercising their First Amendment rights to critique the government and posed no threat to the safety of the officers or any other individual. To the contrary, at multiple points, because Defendant Officers were crowding protesters and shoving them with barricades, bikes, and their hands into a fence, parked cars, and other protesters, Plaintiffs were trapped and unable to move.

283.    No reasonable officer would have concluded that Defendant Officers' indiscriminate use of force was necessary in the absence of individualized, particular, and adequate justification.

284.    MPD and USCP Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Plaintiffs' rights, and should be punished and deterred by an award of punitive damages against Defendant Officers as permitted by law.

285.    At all times relevant, MPD and USCP Defendant Officers were engaged in a civil conspiracy to deprive Plaintiffs of their Fourth Amendment rights and were acting under the color of state law. *See* 42 U.S.C. § 1983.

286.    Additionally, or in the alternative, Plaintiffs are entitled to seek remedy for USCP Defendant Officers' Fourth Amendment violations under the Westfall Act, 28 U.S.C. § 2679(b)(2)(A), because USCP Defendants violated Plaintiffs' constitutional rights through the commission of D.C. torts (assault and battery) against Plaintiffs (*see infra* Count II).

287.    Supervising MPD Defendant Officers were responsible for the conduct of MPD Defendant Officers and had a duty to train, supervise, or instruct them to prevent constitutional harm. Supervising MPD Defendant Officers failed to do so, despite having many opportunities, and in fact encouraged MPD Defendant Officers to use unreasonable and unconstitutionally excessive force. As a result of Supervising MPD Defendant Officers' actions or inactions, Plaintiffs were deprived of their Fourth Amendment right to be free of excessive force.

288.    Supervising USCP Defendant Officers were responsible for the conduct of USCP Defendant Officers and had a duty to train, supervise, or instruct them to prevent constitutional harm. Supervising USCP Defendant Officers failed to do so, despite having many opportunities, and in fact encouraged USCP Defendant Officers to use unreasonable and unconstitutionally excessive force. As a result of Supervising USCP Defendant Officers' actions or inactions, Plaintiffs were deprived of their Fourth Amendment right to be free of excessive force.

289.    MPD and USCP Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Plaintiffs' rights, and should be

punished and deterred by an award of punitive damages against MPD and USCP Defendant Officers as permitted by law.

### Count II: Common Law Assault and Battery
*On Behalf of all Plaintiffs*
*Against All MPD and USCP Defendants for Money Damages and Declaratory Relief and Defendant District of Columbia for Declaratory Relief*

290. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1–259 above.

291. MPD and USCP Defendant Officers intentionally and unlawfully caused harmful and offensive bodily contact with Plaintiffs including by, without limitation:

a. subjecting Plaintiffs Veronica Mosqueda, Alden Dirks, Tamar June, and Sam Rise to illegal neck restraints, including by strangling Plaintiffs with their kefiyyehs;

b. deploying chemical weapons, including pepper spray and tear gas, on Plaintiffs Noelle Gorman, Alden Dirks, Treacy Gaffney, Sam Rise, Veronica Mosqueda, Tamar June, and Sharmin Hossain;

c. deploying a flash bang grenade in the close vicinity of Plaintiff Alden Dirks;

d. yanking Plaintiff Sam Rise's hair so hard that their head was tender and sore, and their hair later fell out in clumps;

e. pushing, striking, shoving, dragging, and body slamming Plaintiffs Sam Rise, Alden Dirks, Beth Gen, Sharmin Hossain, and Tamar June, including down the concrete steps;

f. punching Plaintiff Treacy Gaffney in the face with a closed fist;

63

g. ramming their bicycles into the bodies of Plaintiffs Sam Rise, Tamar June, Sonalee Rashatwar, Treacy Gaffney, and Noelle Gorman;

h. slamming metal barricades down onto the feet of Plaintiffs Sam Rise and Tamar June, injuring and trapping them underneath; and

i. stomping on Plaintiff Sonalee Rashatwar's sandaled feet, causing Sonalee's toenails to lift and bleed and causing Sonalee extreme pain;

j. groping Plaintiff Rashatwar's breasts before slamming him to the ground.

292. MPD and USCP Defendant Officers' violence was in excess of any force Defendant Officers could have reasonably believed was necessary to effectuate arrests of Plaintiffs.

293. Plaintiffs were protesting peacefully, including by chanting and singing, and attending a candlelight vigil.

294. MPD and USCP Defendant Officers did not give a warning, a general order to disperse, a dispersal route, or a statement that Plaintiffs were violating the law in any way before resorting to excessive, unreasonable, and overwhelming force.

295. USCP Defendant Officers are liable under the Westfall Act for committing the torts of assault and battery, and, in so doing, violating Plaintiffs' First and Fourth Amendment rights. *See* Counts I and III.

296. Supervising MPD Defendant Officers were responsible for the conduct of MPD Defendant Officers, and had a duty to train, supervise, or instruct them to prevent constitutional harm. Supervising MPD Defendant Officers failed to do so,

despite having many opportunities, and in fact encouraged MPD Defendant Officers to use unreasonable and unconstitutionally excessive force. As a result of Supervising MPD Defendant Officers' actions or inactions, Plaintiffs were deprived of their Fourth Amendment right to be free of excessive force.

297.    Supervising USCP Defendant Officers were responsible for the conduct of USCP Defendant Officers and had a duty to train, supervise, or instruct them to prevent constitutional harm. Supervising USCP Defendant Officers failed to do so, despite having many opportunities, and in fact encouraged USCP Defendant Officers to use unreasonable and unconstitutionally excessive force. As a result of Supervising USCP Defendant Officers' actions or inactions, Plaintiffs were deprived of their Fourth Amendment right to be free of excessive force.

298.    Defendant District of Columbia is liable for declaratory and equitable relief under the doctrine of *respondeat superior* for the torts of its agents, including Defendant Jason Bagshaw, Supervising MPD Defendant Officers, and MPD Defendant Officers who acted within the scope of their employment on behalf of and in the interests of their employer, the Metropolitan Police Department.

### Count III: First Amendment Retaliation
### 42 U.S.C. § 1983
*On Behalf of All Plaintiffs*
*Against All MPD and USCP Defendants*
*for Money Damages and Declaratory Relief*

299.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1–259 above.

300.    MPD and USCP Defendant Officers unlawfully assaulted and battered Plaintiffs in retaliation for their protected speech in violation of the First Amendment.

301.    Plaintiffs engaged in protected speech and conduct by protesting for a ceasefire in Gaza at the DNC headquarters. Plaintiffs specifically chose to protest at the DNC headquarters because they wanted Congressional lawmakers—who fund the weapons that are killing Palestinians and who could sign Rep. Cori Bush's ceasefire resolution—to hear their political message.

302.    Plaintiffs' protected speech and conduct included: wearing kefiyyehs and matching "Ceasefire Now" t-shirts; carrying banners displaying messages such as, "80% of Democratic Voters Support a Ceasefire"; setting up a candlelight vigil representing 11,000 Palestinian lives lost; and repeating songs and chants that called upon Congressional lawmakers to implement a ceasefire in Gaza.

303.    MPD and USCP Defendant Officers did not have probable cause to arrest Plaintiffs, and Defendant Officers did not charge any Plaintiffs with any crimes. Defendant Officers did not issue a general order for Plaintiffs to disperse, create a dispersal route, nor notify Plaintiffs that they were breaking the law in any way.

304.    There was no lawful reason to use force against Plaintiffs. Nevertheless, MPD and USCP Defendant Officers assaulted and battered Plaintiffs' bodies while they were obviously engaged in nonviolent political speech and conduct. Defendant Officers also attacked Plaintiffs' symbolic speech by destroying the candlelight vigil

for Palestinian lives lost, shredding Plaintiff Alden Dirks's "Ceasefire Now" shirt, and strangling Plaintiffs Samantha Rise and Tamar June with their kefiyyehs.

305.    MPD and USCP Defendant Officers' violent actions would chill the speech of an ordinary person. Every Plaintiff has expressed that Defendant Officers' violence caused them to feel anxiety and apprehension about attending future protests.

306.    MPD and USCP Defendant Officers directly and proximately caused the violation of Plaintiffs' clearly established right to be free from First Amendment retaliation and ensuing compensable injuries.

307.    MPD and USCP Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Plaintiffs' rights, and should be punished and deterred by an award of punitive damages against Defendant Officers as permitted by law.

308.    At all times relevant, MPD and USCP Defendant Officers were engaged in a civil conspiracy to deprive Plaintiffs of their First Amendment rights and were acting under the color of state law. *See* 42 U.S.C. § 1983.

309.    Additionally, or in the alternative, Plaintiffs are entitled to seek remedy for USCP Defendant Officers' First Amendment violations under the Westfall Act, 28 U.S.C. § 2679(b)(2)(A), because USCP Defendants violated Plaintiffs' constitutional rights through the commission of D.C. torts (assault and battery) against Plaintiffs (*see supra* Count II).

310.     Supervising MPD Defendant Officers were responsible for the conduct of MPD Defendant Officers and had a duty to train, supervise, or instruct them to prevent constitutional harm. Supervising MPD Defendant Officers failed to do so, despite having many opportunities, and in fact encouraged MPD Defendant Officers to use assault and battery to retaliate against Plaintiffs for their protected speech. As a result of Supervising MPD Defendant Officers' actions or inactions, Plaintiffs were deprived of their First Amendment right to free speech.

311.     Supervising USCP Defendant Officers were responsible for the conduct of USCP Defendant Officers and had a duty to train or instruct them to prevent constitutional harm. Supervising USCP Defendant Officers failed to do so, despite having many opportunities, and in fact encouraged USCP Defendant Officers to use assault and battery to retaliate against Plaintiffs for their protected speech. As a result of Supervising USCP Defendant Officers' actions or inactions, Plaintiffs were deprived of their First Amendment right to free speech.

312.     MPD and USCP Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Plaintiffs' rights, and should be punished and deterred by an award of punitive damages against MPD and USCP Defendant Officers as permitted by law.

### Count IV: Fourth Amendment Unlawful Seizure
### 42 U.S.C. § 1983
*On Behalf of Plaintiff Beth Gen*
*Against All USCP Defendants*
*for Money Damages and Declaratory Relief*

313.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1–259 above.

314.    Plaintiff Beth Gen has a clearly established right under the Fourth Amendment to be free from unreasonable seizure.

315.    A USCP Defendant Officer unlawfully restrained Beth's freedom of movement without probable cause and with more force than was reasonably necessary to effectuate the seizure.

316.    In particular, a USCP Defendant Officer pinned Beth against a wall, dragged them down the steps, ordered them to put their hands behind their back (which Beth did), and dragged them down the street with the intent to restrain them for the purpose of an investigatory detention. This force was unnecessary to effectuate the seizure because the USCP Defendant Officer could have questioned Beth using no force at all.

317.    At all times relevant, the USCP Defendant Officer was engaged in a civil conspiracy with MPD Defendant Officers to deprive Plaintiff Beth Gen of their Fourth Amendment rights and was acting under the color of state law. *See* 42 U.S.C. § 1983.

318.    Additionally, or in the alternative, Plaintiff Beth Gen is entitled to seek remedy for the USCP Defendant Officer's Fourth Amendment violation under the Westfall Act, 28 U.S.C. § 2679(b)(2)(A), because the USCP Defendant Officer violated

Beth's constitutional rights through the commission of D.C. torts (assault and battery) against Plaintiff (*see supra* Count II).

319.    Supervising USCP Defendant Officers were responsible for the conduct of the USCP Defendant Officer and had a duty to train, supervise, or instruct them to prevent constitutional harm. Supervising USCP Defendant Officers failed to do so, despite having many opportunities, and in fact encouraged USCP Defendant Officers to use assault and battery to retaliate against Plaintiffs for their protected speech. As a result of Supervising USCP Defendant Officers' actions or inactions, Plaintiff Beth Gen was deprived of their Fourth Amendment right to be free of unreasonable seizure.

320.    The USCP Defendant Officer's actions were willful, deliberate, and malicious, involved reckless or callous indifference to Plaintiff Beth Gen's rights, and should be punished and deterred by an award of punitive damages against the USCP Defendant Officer as permitted by law.

### Count VI: Negligence Per Se
### D.C. Code § 5-331.07
*On Behalf of All Plaintiffs*
*Against All MPD Defendants for Money Damages and Declaratory Relief*
*and the District of Columbia for Declaratory Relief*

321.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1–259 above.

322.    At the protest, Plaintiffs were engaged in speech and conduct protected by the First Amendment. *See supra* ¶¶ 105–08, 143, 166, 177, 193, 209, 222–23, 234–36, 249, & 300–06. The First Amendment Assemblies Act ("FAAA") (D.C. Code § 5-

70

331.07) is a statute that is meant to promote public safety, for protesters like the Plaintiffs and others, and it imposes clear and specific requirements for MPD's conduct when deciding to disperse a public demonstration.

323.   The FAAA requires MPD officers to issue "at least one clearly audible and understandable order to disperse using an amplification system or device, and shall provide the participants a reasonable and adequate time to disperse and a clear and safe route for dispersal." *Id.* It also requires MPD "to enforce the restrictions through voluntary compliance and then seek, as appropriate, to enforce the restrictions by issuing citations to, or by arresting, the *specific* non-compliant persons, where *probable cause* to issue a citation or to arrest is present." *Id.* (emphasis added). Dispersal orders must be captured on body-worn camera ("BWC") footage. *Id.*

324.   Defendant Jason Bagshaw, Supervising MPD Defendant Officers, and MPD Defendant Officers did not issue a clearly audible dispersal order on an amplification system nor create a clear safe route for dispersal before violently dispersing the protest. They did not formally arrest or issue a citation for any protesters for whom probable cause was present. Instead, they immediately assaulted and battered Plaintiffs without warning or probable cause. *See supra* Count II.

325.   Defendant District of Columbia is liable for declaratory and equitable relief under the doctrine of *respondeat superior* for the actions of its agents, including Defendant Jason Bagshaw, Supervising MPD Defendant Officers, and MPD Defendant Officers who acted within the scope of their employment on behalf of and in the interests of their employer, the Metropolitan Police Department.

326.   Plaintiffs therefore bring a negligence per se claim against Defendant Jason Bagshaw, Supervising MPD Defendant Officers, MPD Defendant Officers, and the District of Columbia for violating D.C. Code § 5-331.07 at Plaintiffs' protest.

## REQUEST FOR RELIEF

Plaintiffs respectfully requests that this Court hold a jury trial and grant the following relief:

a. Entry of a declaratory judgment that the conduct and actions described in this Complaint constitute violations of the First and Fourth Amendments to the U.S. Constitution; the Ku Klux Klan Act, 42 U.S.C. § 1983; the First Amendment Assemblies Act, D.C. Code § 5-331.07; and the common law;

b. An award of all available compensatory damages to Plaintiffs in an amount to be determined at trial;

c. An award of all available punitive damages in an amount that would punish Defendant Officers for the willful, wanton, and reckless conduct alleged in this Complaint, and that would effectively deter similar conduct in the future;

d. An award of Plaintiff's reasonable attorneys' fees and costs and expenses pursuant to 42 U.S.C. § 1988 and any other applicable statutes or rules or law; and

e. Such other and further relief, including all appropriate and equitable relief, as this Court may deem just and proper.

Respectfully submitted this 16th day of August, 2024.


/s/__*Barbara Franco Olshansky*_____          /s/__*Sumayya Saleh*_____
Barbara Franco Olshansky                         Sumayya Saleh*
District of D.C. Bar No. NY0057                   D.C. Bar No. 1743427
KENSINGTON CENTER FOR JUSTICE                     Brittany Francis*
HUMAN RIGHTS ADVOCATES                            D.C. Bar No. 90008960
707 Beverley Road                                Kiah Duggins**
Brooklyn, NY 11218                               D.C. Bar No. 1779266
Phone: (650) 388-2237                            Shirley LaVarco**
                                                 D.C. Bar No. 90005167
                                                 CIVIL RIGHTS CORPS
                                                 1601 Connecticut Ave. NW, Suite 800
                                                 Washington, D.C. 20009
                                                 Phone: (202) 844-4975


                                                 *pending admission to this Court
                                                 ** pending admission *pro hac vice*