## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SAM RISE**, *et al.*,<br><br>          *Plaintiffs,*<br><br>**v.**<br><br>**JASON BAGSHAW**, *et al.*,<br><br>          *Defendants*. | **Case No. 1:24-cv-2388-RCL** |

## <u>MEMORANDUM OPINION</u>

On the evening of November 15, 2023, the nine plaintiffs in this dispute joined a protest outside the Democratic National Committee headquarters to voice their opposition to the war in Gaza between Israel and the terrorist group Hamas.  It is contested whether the protest was lawful and peaceful or unlawful and violent.  It is uncontested, however, that officers of the D.C. Metropolitan Police Department ("MPD") and the United States Capitol Police ("USCP") arrived on the scene to disperse the protest.  The plaintiffs allege that the police unlawfully seized and used excessive force against them in violation of the Fourth Amendment, illicitly targeted them due to their expressive conduct in violation of the First Amendment, and assaulted and battered them in violation of D.C. common law.

Named officers of the USCP, as well as unnamed USCP "John Doe" officers (collectively, the "federal defendants"), have moved to dismiss the claims against them in both their official and individual capacities.  The federal defendants' motion to dismiss the plaintiffs' official capacity claims will be **DENIED AS MOOT** because, as the plaintiffs have clarified, they bring no official capacity claims.  However, for the reasons contained herein, the federal defendants' Motion to dismiss the claims brought against them in their individual capacities will be **GRANTED**.

1

## I.  BACKGROUND

### A.  Factual History

The following allegations derive almost entirely from the plaintiffs' Amended Complaint, ECF No. 20.  Some additional details are drawn from contemporaneous online statements issued by the USCP and Congressman Brad Sherman (which may properly be considered because they are incorporated by reference in the Amended Complaint[1]) and a map of the USCP's extended jurisdiction (which is attached to one of the defendants' briefs, and of which the Court takes judicial notice).  *See* Boundary of Extended Jurisdiction, Reply in Support of Mot. to Dismiss for Individual Capacity Federal Defendants Attach. 1, ECF No. 48-1; *see also* Traffic Regulations for the United States Capitol Grounds A85, United States Capitol Police Board (Feb. 7, 2019), https://www.uscp.gov/sites/evo-subsites/www.uscp.gov/files/documents/Capitol%20Police%20Board%20US%20Capitol%20Grounds%20Traffic%20Regulations%20-%20For%20Public%20Release.pdf [https://perma.cc/F5R6-3UGT].

On October 7, 2023, Hamas, the terrorist group which controls the Gaza Strip, launched a surprise attack on southern Israel, killing or kidnapping more than 1,200 Israeli civilians and soldiers.  Am. Compl. ¶ 36, ECF No. 20.  The United States has provided funds and materiel that Israel has used in the course of its ensuing war against Hamas.  *Id.* ¶¶ 4 n.9, 38, 41.  As of the time of the incidents at the center of this dispute, the Palestinian health ministry reported that Israel's

---

[1] If a document is not attached to a complaint, it may nevertheless be treated as incorporated by reference—and may therefore be considered at the motion-to-dismiss stage without converting the motion to dismiss into a motion for summary judgment—if the document is "referred to in the complaint and . . . integral to [the plaintiff's] claim." *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  In this case, the USCP's statement is integral to the plaintiffs' Section 1983 claims, which hinge on the plaintiffs' allegations of a civil conspiracy between the USCP and the MPD to violate the protesters' constitutional rights.  The USCP's statement is integral to those claims because it suggests a plausible alternative explanation for the parallel conduct of the MPD and USCP, which in turn affects the plaintiffs' burden to plausibly allege a civil conspiracy between those entities.  This is discussed in greater detail below.

military response in Gaza had killed over 11,000 people, including a large number of civilians. *Id.* ¶ 39 & n.31.

On November 15, 2023, the Democratic National Committee held a private fundraising dinner at its headquarters building, which is located at 430 South Capitol Street SE in Washington, DC. *Id.* ¶¶ 43, 56. In attendance were at least two Congressmen, House Minority Leader Hakeem Jeffries and Representative Brad Sherman. *Id.* ¶ 43. Around 7:00 PM, over 100 protesters, including the plaintiffs, gathered outside the DNC building to agitate for a ceasefire in Gaza and an end to the United States' military support for Israel. *Id.* ¶¶ 44, 47. In short order, MPD and USCP officers arrived and attempted to disperse the protesters. *Id.* ¶ 55.

The plaintiffs allege that the police response involved the use of excessive force. For example, the plaintiffs represent that officers dragged or threw people down from the steps in front of the headquarters building, *id.* ¶ 62; that they used pepper spray as well as flash bang and vapor grenades, *id.* ¶¶ 64, 72–73; that they employed "kettling tactics" to force protesters into confined spaces and pinned them up against fences and parked cars, *id.* ¶¶ 66, 70, 79; and that they shoved, trampled, strangled, and hit protesters with shields and batons. *Id.* ¶¶ 63,74, 76.

The plaintiffs contend that the police response was excessive and unreasonable because the protest was peaceful. Specifically, the plaintiffs claim that the protestors were chanting, singing, and holding a candlelight vigil, *id.* ¶¶ 49, 54, 282, and that they were "not blocking walkways, damaging property, or violating any laws." *Id.* ¶ 91. The plaintiffs also maintain that the directive to use force was unprompted and that the officers never issued a warning or dispersal order. *Id.* ¶¶ 83, 90. However, the Amended Complaint incorporates an official press release issued by the USCP, which tells a very different story: the protesters used dumpsters to block the DNC building's exits, "failed to obey . . . lawful orders to move back from the DNC," pepper sprayed

officers who responded to the scene, and attempted to remove bike rack barriers that had been erected, ultimately resulting in injuries to six officers. *See USCP Statement on the Unlawful Demonstration Outside the DNC*, U.S. Capitol Police (Nov. 16, 2023), https://www.uscp.gov/media-center/press-releases/uscp-statement-unlawful-demonstration-outside-dnc [https://perma.cc/B8ZV-F53M] (cited at Am. Compl. ¶ 98 n.51) ("USCP Statement"). The press release continues, and the Amended Complaint also acknowledges, that one protester, Ruben Arthur Camacho, was arrested and charged with assault for slamming a female officer into a garage door and then punching her in the face. *Id.*; *see also* Am. Compl. ¶ 99. The Amended Complaint further cites a social media post by Congressman Brad Sherman, who was in attendance at the dinner, and who confirmed that the protesters attempted to break into the building and pepper sprayed the police. *See* Am. Compl. ¶ 98 & n.52. The Amended Complaint notes that some of the protesters were gathered on the front steps at the entrance to the DNC building. *Id.* ¶ 48.

The plaintiffs contend, however, that only the police used pepper spray on the evening of the protest, and that the details contained in the USCP's press release were concocted after the fact to justify the police response. *Id.* ¶ 99. In any event, the plaintiffs allege that they individually have not been arrested or charged with any crime and claim that they did not threaten anybody, destroy any property, attempt to enter the DNC building or prevent anybody from leaving the building—though the Amended Complaint acknowledges that one plaintiff "reflexively grabbed" the door handle of the DNC building at some point. *Id.* ¶¶ 101–04, 185.

For the sake of brevity, a non-exhaustive summary of the plaintiffs' individual allegations follows: Sam Rise claims to have been choked, pushed, grabbed painfully by the arm, pinned against a barricade, and tear gassed. *Id.* ¶¶ 112, 115, 120–21, 129. Tamar June claims to have sustained injuries to her neck from being choked, and to her foot from when an officer stomped on

4

a metal barricade resting on it.  *Id.* ¶¶ 148–49, 153.  Sonalee Rashatwar claims to have been groped by the breast and pushed against a car, and claims to experience ongoing anxiety and depression. *Id.* ¶¶ 170–71, 177.  Alden Dirks claims to have been strangled, pepper sprayed, and punched repeatedly in the arm that was grabbing the DNC's door handle.  *Id.* ¶¶ 180, 183, 185.  Veronica Mosqueda claims to have been thrown to the ground multiple times and grabbed by the neck.  *Id.* ¶¶ 197–99.  Sharmin Hossain claims that officers grabbed her hair, slammed her against a car, and tear gassed her. *Id.* ¶¶ 212–14.  Treacy Gaffney claims that officers rammed bikes into her, pepper sprayed her at close range, and punched her in the face.  *Id.* ¶¶ 227–28.  Noelle Gorman claims to have been shoved and pepper sprayed at close range.  *Id.* ¶¶ 239, 241.  Finally, Beth Gen claims to have been slammed into a wall and dragged from the DNC's front steps before being escorted away from the scene and questioned by an officer.  *Id.* ¶¶ 253–57.

### B. Procedural History

On August 16, 2024, the plaintiffs filed their Complaint, *see* Compl., ECF No. 1.  On September 24, 2024, the plaintiffs filed a Standard Form 95, the form used to present tort claims against the United States government pursuant to the Federal Tort Claims Act ("FTCA").  *See* Mot. to Dismiss for Official Capacity Federal Defendants at 6, ECF No. 35 ("Official Capacity Mot.").  The plaintiffs filed the operative Amended Complaint on November 18, 2024.  *See* Am. Compl.  The Amended Complaint contains five counts.  Count I, brought pursuant to 42 U.S.C. § 1983, alleges that the MPD officers and the federal defendants violated the Fourth Amendment by using excessive and unreasonable force.  *Id.* ¶¶ 267–91.  Count II is a common law assault and battery claim, brought against the MPD officers, the District of Columbia, and the federal defendants.  *Id.* ¶¶ 292–300.  As will become particularly salient later, the plaintiffs write that their common law tort claim is brought "under the Westfall Act" to remedy violations of the

"[p]laintiffs' First and Fourth Amendment rights." *Id.* ¶ 297. Count III is another § 1983 claim against the MPD officers and the federal defendants alleging retaliation in violation of the First Amendment. *Id.* ¶¶ 301–14. Count IV, brought only on behalf of plaintiff Beth Gen, is another § 1983 claim, alleging an unlawful seizure in violation of the Fourth Amendment.[2]

The Amended Complaint specifically states that the "John Doe Supervising USCP Officers" and "John Doe USCP Officers" are being sued in their individual capacities only. *See Id.* ¶¶ 32, 34. However, the Amended Complaint also singles out by name USCP officer Sergeant Joseph Sobnosky IV, and does not state whether the plaintiffs intended to sue him in his individual or official capacity, or both. *See id.* ¶ 31.[3]

Perhaps in response to this ambiguity, the defendants first moved on February 18, 2025 to dismiss the claims brought against the federal defendants in their official capacities, arguing that Count II should be dismissed for failure to plead exhaustion of administrative remedies under the FTCA, and that the other counts should be dismissed because 42 U.S.C. § 1983 does not contain a waiver of sovereign immunity for official-capacity suits against federal officials. *See generally* Official Capacity Mot. The plaintiffs' response confirms unequivocally that the plaintiffs are not bringing any claims against the federal defendants in their official capacities. *See* Opp'n to Mot. to Dismiss for Official Capacity Federal Defendants at 9, ECF No. 42 ("Plaintiffs have not brought any official capacity claims . . . .") ("Official Capacity Opp'n"); *id.* at 10 ("[T]he USCP Defendants

---

[2] The Complaint and Amended Complaint both contain a fifth count, perplexingly titled "Count VI" (neither version of the complaint contains a "Count V"). Count VI is brought only against the MPD officers and the District of Columbia for negligence *per se*, arguing that the MPD's failure to issue an audible dispersal order using a voice amplification device and then provide a reasonable opportunity for the protesters to safely disperse violated the First Amendment Assemblies Act, D.C. Code § 5-331.07. *See* Am. Compl. ¶¶ 323–28. The two motions to dismiss discussed and adjudicated in this Opinion concern only the plaintiffs' claims against the federal defendants, not those against the MPD or the District of Columbia. So, Count VI is irrelevant at this time.

[3] Confusingly, the Amended Complaint also names Sergeant Sobnosky as one of the John Doe USCP Officers. Am. Compl. ¶ 34.

are sued in their *individual*—not official—capacities.") (emphasis in original). Because the plaintiffs have clarified that they are bringing no official capacity claims against the federal defendants, the defendants' motion to dismiss the plaintiffs' official capacity claims will be **DENIED AS MOOT**, as there are no such claims to dismiss.

On March 24, 2025, the defendants moved to dismiss the plaintiffs' claims brought against the federal defendants in their individual capacities, pursuant to Federal Rule of Civil Procedure 12(b)(1). *See* Mot. to Dismiss for Individual Capacity Federal Defendants, ECF No. 46 ("Individual Capacity Mot."). In that Motion, the federal defendants reiterate the argument raised in their prior motion that the plaintiffs' common law assault and battery claim is jurisdictionally foreclosed by their failure to plead administrative exhaustion under the FTCA. *Id.* at 5. They argue as well that the plaintiffs' § 1983 claims should be dismissed because the USCP officers were not acting under color of state law, *id.* at 4–7, and that the plaintiffs should not be allowed to further amend their Complaint to include a *Bivens* claim because such a claim would be futile. *Id.* at 7–21. In their response, the plaintiffs expressly disavow any intent to bring a *Bivens* claim. *See* Opp'n to Mot. to Dismiss for Individual Capacity Federal Defendants at 4, ECF No. 47 ("Plaintiffs do not seek relief under *Bivens*.") ("Individual Capacity Opp'n"); *id.* at 9 (same). The plaintiffs' response also helpfully clarifies the nature of their common law assault and battery claim: They do not dispute that they have not satisfied the administrative exhaustion procedures prescribed by the FTCA, but argue that neither the Westfall Act nor the FTCA bars common law tort claims that are intended to vindicate the violation of a constitutional right—such as theirs—so administrative exhaustion is unnecessary. *Id.* at 12–14.

The defendants submitted their reply on April 10, 2025. *See* Reply in Support of Mot. to Dismiss Individual Capacity Federal Defendants, ECF No. 48 ("Individual Capacity Reply"). On

April 18, 2025, the plaintiffs moved for leave to file a surreply, ECF No. 51, which the Court granted on April 22, 2025. *See* Order of April 22, 2025, ECF No. 52. The plaintiffs filed their surreply on April 30, 2025. *See* Surreply in Opposition to Mot. to Dismiss Individual Capacity Federal Defendants, ECF No. 55 ("Individual Capacity Surreply"). The Motion to Dismiss the plaintiffs' individual capacity claims against the federal defendants is therefore now ripe for the Court's review. For the reasons that follow, that Motion will be **GRANTED**.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(1) and Subject-Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action or a claim over which the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The party seeking to invoke the court's jurisdiction bears the burden of demonstrating that it exists. *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). When evaluating a Rule 12(b)(1) motion, a court must accept the complaint's factual allegations as true. *Hill v. Smoot*, 308 F. Supp. 3d 14, 18 (D.D.C. 2018) (citing *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993)). However, because the Court has an obligation to independently assure itself of its subject-matter jurisdiction, the plaintiff's allegations "'will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a [Rule] 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1350 (2d ed. 1987)).

### B.    The Plaintiffs' Attempt to Supply an Alternative Rule 12(b)(1) Standard Fails

The plaintiffs advance a different view of how courts should adjudicate motions to dismiss brought pursuant to Rule 12(b)(1). First, the plaintiffs argue that dismissal for lack of subject-matter jurisdiction is appropriate only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See* Individual Capacity

Opp'n at 8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  As the plaintiffs' brief recalls, this passage from *Scheuer* derives in turn from *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).

There are two rather glaring problems with the plaintiffs' invocation of the *Conley* standard.  For one, this passage from *Conley* explicitly addresses the circumstances under which "a complaint should . . . be dismissed for *failure to state a claim* . . . ."  *Conley*, 355 U.S. at 45 (emphasis added).  To reiterate, the defendants have not moved for dismissal for failure to state a claim, a motion which would be brought under Federal Rule of Civil Procedure 12(b)(6); they have moved for dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1).  The question for the court to decide on a Rule 12(b)(1) motion is not whether the plaintiffs' allegations, taken as true, show that they are "entitle[d] . . . to relief."  *Conley*, 355 U.S. at 46.  The question is rather whether the court has jurisdiction to hear the dispute in the first place.  But even more importantly, in the landmark 2007 case *Bell Atlantic Corp. v. Twombly*, the Supreme Court "retired the *Conley* no-set-of-facts test," replacing it with the well-known "plausibility standard."  *Ashcroft v. Iqbal*, 556 U.S. 662, 670, 678 (2009) (citing *Twombly*, 550 U.S. 544, 556, 570 (2007), and reaffirming *Conley*'s obsolescence).  The Court therefore rejects the plaintiffs' anachronistic proposal to apply a standard that has been consigned to antiquity for nearly two decades.[4]

Next, the plaintiffs argue that "questions of statutory interpretation are not jurisdictional in nature."  Individual Capacity Opp'n at 8 (citing *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104–05 (D.C. Cir. 2005)).  They advance this theory seemingly in defense of their § 1983 claims, contending that "[w]hether a federal entity or agent was acting under color of federal or state law is an issue of statutory interpretation, not subject matter jurisdiction."  *Id.* at 9.

---

[4] *Twombly* and *Iqbal* are mainstays of the American civil procedure curriculum and were already ranked among the top five most cited Supreme Court cases of all time within ten years of their issuance.  *See* Adam Steinman, *The Rise and Fall of Plausibility Pleading?*, 69 Vand. L. Rev. 333, 389 (2016).  It is, therefore, somewhat surprising to hear the *Conley* standard invoked in the year 2025, as the plausibility standard approaches its twentieth anniversary.

The plaintiffs have sorely misread *Settles*. In that case, the defendant, the U.S. Parole Commission, failed to raise certain defenses relying on statutory interpretation—i.e., that it did not act under color of D.C. law and that it is not a "person" within the meaning of § 1983—before the district court, and then attempted to raise those arguments for the first time on appeal. *Settles*, 429 F.3d at 1103–05. The D.C. Circuit held that the Parole Commission had waived these interpretive arguments by failing to first present them to the trial court. In the case at hand, however, the federal defendants *have* timely raised their statutory interpretation defenses—i.e., that the USCP officers were not acting under color of state law within the meaning of § 1983—before this Court. *See* Individual Capacity Mot. at 4–7. Thus, *Settles* is of no use to the plaintiffs unless it stands for the maximalist proposition that questions of statutory interpretation—such as whether a given actor was acting under color of state law—can *never* have jurisdictional implications.

*Settles*, of course, does not stand for something so patently wrong. The federal district courts were created by statute and possess only such limited jurisdiction as is provided by statute. *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850). Necessarily, then, the courts' exercise of subject-matter jurisdiction depends on interpreting statutory grants of jurisdiction. Often, that interpretive task generates little or no attention in an opinion because the outcome is so obvious. But at the risk of beating a dead horse, our legal tradition is replete with cases prominently featuring interpretive disputes of obvious, and often dispositive, jurisdictional significance. *See, e.g.*, *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("In this case . . . the impediment to subject-matter jurisdiction on which [the defendant] relies—lack of complete diversity—rests on statutory interpretation . . . ."); *Republic of Argentina v. Weltover*, 504 U.S. 607, 610–20 (1992) (the Court's jurisdiction over a contract dispute against the government of Argentina depended on the interpretation of the phrases "commercial activity" and "direct effect" as used in the Foreign

Sovereign Immunities Act); *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1908)

(interpreting the words "arising under the Constitution or laws of the United States," as used in the

then-extant version of the federal question jurisdiction statute, to confer jurisdiction only if a matter

of federal law is presented on the face of a complaint, rather than in "some anticipated defense to

[the plaintiff's] cause of action"); *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 204 (1997)

(interpreting what it means to "'ha[ve]' an employee" for purposes of 42 U.S.C. § 2000e(b), and

reversing the trial court's dismissal for lack of jurisdiction on the basis of that construction);

*Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace & Agric.*

*Implement Workers of Am., Int'l Union*, 523 U.S. 653, 657 (1998) (interpreting the words "[s]uits

for violation of contracts" in § 301(a) of the Labor Management Relations Act of 1947 to confer

subject-matter jurisdiction over suits alleging the breach of a collective bargaining agreement, but

not over claims that such an agreement is invalid, e.g. due to fraud-in-the-inducement).

  The plaintiffs' argument that questions of statutory interpretation necessarily speak to the

merits of a case rather than to the court's jurisdiction is especially odd in light of this Circuit's

treatment of § 1983 appeals since *Settles*.  On multiple occasions the D.C. Circuit has affirmed

dismissals on *jurisdictional* grounds because the defendants were deemed not to be acting under

color of state law within the meaning of the statute—the very same interpretive issue raised here.

*See, e.g.*, *Lamb v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 790 Fed. App'x 222,

222 (D.C. Cir. 2020) ("The district court properly dismissed for lack of subject matter jurisdiction

appellant's claims for money damages . . . under 42 U.S.C. § 1983, because appellant has not

shown that the agencies acted under color of state law . . . ."); *Harris v. Bowser*, No. 19-5246,

2020 WL 873558, at *1 (D.C. Cir. Feb. 14, 2020) ("The district court properly dismissed the claims

against the Department of Justice and Jessie Liu for lack of subject matter jurisdiction.  Federal

officials are not subject to Section 1983 liability."); *Bourdon v. Mabus*, No. 11-5302, 2012 WL 1155737, at *1 (D.C. Cir. Mar. 28, 2012) (holding that "the district court properly dismissed all claims against the federal appellees for lack of jurisdiction," including a § 1983 claim which "failed . . . because the statute does not apply to federal officials acting under color of federal law").

### C.  The Westfall Act, FTCA, and Administrative Exhaustion

Congress has provided a statutory framework governing tort claims against federal employees that arise out of their performance of their official duties:

> "The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties.  See 28 U.S.C. § 2679(b)(1).  When a federal employee is sued for wrongful or negligent conduct, the Act empowers the Attorney General to certify that the employee 'was acting within the scope of his office or employment at the time of the incident out of which the claim arose.' § 2679(d)(1), (2).  Upon the Attorney General's certification, the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee.  The litigation is thereafter governed by the Federal Tort Claims Act (FTCA) . . . ."

*Osborn v. Haley*, 549 U.S. 225, 229–30 (2007).  In this case, the Chief of the Civil Division of the D.C. United States Attorney's Office, as the Attorney General's delegee, certified on December 26, 2024 that the federal defendants were acting within the scope of their employment at the time of the alleged incidents.  *See* Notice of Westfall Certification, ECF No. 30.  Therefore, tort claims raised against the federal defendants presumptively fall within the Westfall–FTCA framework.

"The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."  *McNeil v. United States*, 508 U.S. 106, 113 (1993).  The statute provides that "no action shall be instituted upon a claim against the United States for money damages caused by acts of its employees 'unless the claimant shall have first presented the claim to the appropriate federal agency . . . .'" *Simpkins v. Dist. of Columbia Gov't*, 108 F.3d 366, 370 (D.C. Cir. 1997) (quoting 28 U.S.C. § 2675(a)).  "Claimants are entitled to file suit at the point at

which the claim presented is finally denied, or six months after it is presented if the agency fails to make final disposition of the claim within that period." *GAF Corp. v. United States*, 818 F.2d 901, 905 (D.C. Cir. 1987).

Satisfaction of the administrative-filing requirement "is a jurisdictional prerequisite to the maintenance of a tort suit against the United States." *Id.* at 904. A plaintiff may not cure his failure to exhaust administrative remedies by fulfilling the administrative presentment requirement after the filing of the original complaint. *Wilson v. United States*, No. 22-cv-3639-RCL, 2024 WL 756804, at *6 (D.D.C. Feb. 23, 2024) (Lamberth, J.) (collecting cases for the proposition that "under the FTCA, the appropriate analysis is whether the plaintiff exhausted his administrative remedies *at the time* he filed the lawsuit, not whether the exhaustion requirement was eventually satisfied at a later date") (emphasis in original). Similarly, "the failure to exhaust administrative remedies *prior* to filing suit cannot be remedied by amending the complaint at a later date." *Edwards v. Dist. of Columbia*, 616 F. Supp. 2d 112, 117 (D.D.C. 2009) (emphasis in original) (collecting cases).

## III.  ANALYSIS

After two rounds of motion-to-dismiss briefing, the contours of this dispute have sharpened. The plaintiffs have two arguments against dismissal. First, the plaintiffs argue that the Court has jurisdiction to hear their § 1983 claims (Counts I, III, and IV) based on a narrow theory dictating that federal actors are deemed to act under color of state law if they conspire with state officials to violate a plaintiff's constitutional rights. The plaintiffs contend that this theory applies because the federal defendants conspired with the MPD to violate the plaintiffs' First and Fourth Amendment rights. Second, the plaintiffs argue that the Court has jurisdiction to entertain their common law assault and battery claim (Count II) because it was brought to remedy violations of constitutional rights, which vitiates the defendants' substitution of the United States as a defendant

under the Westfall Act and exempts the plaintiffs' claim from the FTCA's administrative exhaustion framework. Neither argument is persuasive. The Court addresses each in turn.

### A. The Court Lacks Jurisdiction Over Plaintiffs' § 1983 Claims Because They Have Failed To Plead That the Federal Defendants Acted Under Color of State Law

42 U.S.C. § 1983 provides a cause of action for the violation of constitutional rights by a person who acts "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." This requirement that the defendant have acted "under color of state law" is a "jurisdictional requisite for a § 1983 action." *Polk Cnty. v. Dodson*, 454 U.S. 312, 315 (1981). It is well-established that "Section 1983 does not apply to federal officials acting under color of federal law." *Settles*, 429 F.3d at 1104.

There can be no serious dispute that the United States Capitol Police, who are federal agents, are authorized under *federal* law to undertake policing activities around the DNC building. Capitol Police officers take directions from the "Capitol Police Board, consisting of the Sergeant at Arms of the United States Senate, the Sergeant at Arms of the House of Representatives, and the Architect of the Capitol . . . ." 2 U.S.C. § 1961(a). In other words, they take orders from *federal* officials, not from local D.C. officials. They are also authorized by *federal* law to enforce the law and make arrests within their geographic jurisdiction, *id.*, which undoubtedly encompasses the DNC building. *See* 2 U.S.C. ¶ 1967(a)(4), (b)(1).[5, 6]

---

[5] They are further authorized by *federal* law to "protect, in any area of the United States, the person of any Member of Congress . . . if the Capitol Police Board determines such protection to be necessary." 2 U.S.C. § 1966(a). The Amended Complaint makes clear that at least two members of Congress were present at the DNC building at the time of the alleged incidents and had to be escorted out of the building. Am. Compl. ¶ 78.

[6] Contrary to the plaintiffs' suggestion, it is of no moment that the DNC building is private property that is *also* within the geographic jurisdiction of the MPD. Individual Capacity Opp'n at 17–18 (citing various MPD General Orders). It is crystal clear that the DNC building is within the Capitol Police's statutory grant of geographic jurisdiction, so there is no basis to argue that the federal defendants were acting under the color of D.C. law simply by responding to an incident there. Even if MPD's General Order 801.01 declares that it bears "primary law enforcement authority"

Unsurprisingly, then, the § 1983 case law in this District has generally classified Capitol Police officers as federal agents who act under color of federal law, and who are therefore not susceptible to a § 1983 action. *See, e.g.*, *Leonard v. George Wash. Univ. Hosp.*, 273 F. Supp. 3d 247, 255 n.6 (D.D.C. 2017) ("Section 1983 does not typically apply to individuals employed by federal entities such as the FBI and the Capitol Police . . . ."); *Saddler v. D'Ambrosio*, 759 F. Supp. 4, 8–9 (D.D.C. 1990) (dismissing a § 1983 claim against a Capitol Police officer because "as a United States Capitol Police Officer, [the defendant] was acting under color of federal law, not under state law or District of Columbia law"); *Fischer v. Dist. of Columbia*, No. 24-cv-0044, 2025 WL 894445, at *14 (D.D.C. Mar. 24, 2025) ("[B]ecause [the plaintiff] had not pled that the USCP officers . . . were acting under color of District law, he cannot assert a § 1983 claim against them.").

To salvage their claim, plaintiffs point to a narrow exception: "[W]hen federal officers act together or conspire with state officials to deprive an individual of his constitutional rights, they may be considered to have acted under color of state law for § 1983 purposes." *Fischer*, 2025 WL 894445, at *12; *see also Williams v. United States*, 396 F.3d 412, 414 (D.C. Cir. 2005) ("In cases under section 1983, circuit courts looking at whether defendants have acted 'under color of' state law have . . . focused on whether these defendants are state officials or have conspired with state officials in committing the alleged illegal acts."). It is not enough to allege that federal officials have done the same thing or pursued the same objectives as state officials; a plaintiff must allege, at a minimum, that "the state 'gave [the federal official] the power' to act, 'exercised . . . coercive power' through him, or otherwise 'provid[ed] significant encouragement," *Fischer*, 2025 WL

---

for policing civil disturbances on non-federal property in D.C., USCP is not restricted by MPD's regulations, and moreover, the use of the word "primary" implies that the MPD's jurisdiction is not understood to be exclusive.

894445, at *13 (quoting *Williams*, 396 F.3d at 415), or else that there was some conscious conspiracy between the state and local officials to violate that plaintiff's constitutional rights.  *Id.*

A "meeting of the minds" is "'an essential element of a conspiracy claim.'"  *Id.* (quoting *Graves v. United States*, 961 F. Supp. 314, 320 (D.D.C. 1997); *see also Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 61–62 (D.D.C. 2019) (noting that "the 'principal' element in alleging a civil conspiracy is an 'agreement between the parties to inflict a wrong against or injury upon another,'" and that "[a] common goal, never discussed explicitly or implicitly among the [d]efendants, does not constitute an agreement") (quoting *McManus v. Dist. of Columbia*, 530 F. Supp. 2d 46, 74 (D.D.C. 2007)); *id.* at 62 (finding no conspiracy where the plaintiffs failed to allege that the defendants "knew each other prior to the protest or that they communicated with each other during the protest," or to establish when the "[d]efendants would have had the opportunity to form . . . an agreement").  "Particularly where the defendant[s'] allegedly unlawful conduct has 'an obvious alternative explanation,' the complaint must allege facts that 'plausibly suggest[]'—and are 'not merely consistent with'—the defendant[s'] liability."  *Vindman v. Trump*, No. 22-cv-257-JEB, 2022 WL 16758575, at *4 (D.D.C. Nov. 8, 2022) (first quoting *Twombly*, 550 U.S. at 557, 567, and then citing *Iqbal*, 556 U.S. at 682); *cf. 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013) ("[Y]ou can't assess the plausibility of an inference in a vacuum.  The reasonableness of one explanation for an incident depends, in part, on the strength of competing explanations.") (Sutton, J.).  To be sure, a plaintiff need not have caught the supposed co-conspirators red-handed; a complaint "considered in context" may raise a sufficiently plausible inference that a conspiracy existed.  *See Soo Park v. Thompson*, 851 F.3d 910, 927 & n.22 (9th Cir. 2017); *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 97–98 (D.D.C. 2016) (declining to dismiss a conspiracy allegation where the supposed "scheme could not have operated as described

. . . without an agreement between" the alleged conspirators).  However, pleading only "parallel conduct that could just as well be independent action" is undoubtedly insufficient, as is pleading joint conduct that is typical of how the parties might reasonably be expected to behave in the absence of a conspiracy.  *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 114 (D.D.C. 2010) (quoting *Twombly*, 550 U.S. at 557); *see also Barrett v. PAE Gov't Servs., Inc.*, 975 F.3d 416, 435 (4th Cir. 2020) (affirming dismissal of a § 1983 claim predicated on an alleged conspiracy because the exchanges between the supposed conspirators identified by the plaintiff were "consistent with the normal interaction[s]" between actors of that type).

Here, the plaintiffs assert the existence of a conspiracy between the federal defendants and the MPD, but their allegations fall far short.  The Amended Complaint clearly alleges that both the MPD and USCP forcefully cracked down on the plaintiffs' protest at the same time, alongside one another, and using similar means.  But it contains no allegations whatsoever that suggest a "meeting of the minds," *Fischer*, 2025 WL 894445 at *13, or an "agreement between the parties to inflict a wrong against or injury upon another," the "'principal' element" of a conspiracy claim. *Kurd*, 374 F. Supp. 3d at 61 (quoting *McManus*, 530 F. Supp. at 74).  The conduct alleged in the Amended Complaint is entirely consistent with the USCP and MPD, two police forces with overlapping jurisdiction over the place of the protest, both responding independently to it at the same time.  Indeed, the plaintiffs in this case are situated more-or-less identically to the plaintiff in *Fischer*, a Capitol Riots participant who alleged a conspiracy between MPD and USCP officers responding to the events of January 6, 2021 but pleaded only examples of parallel conduct.  2025 WL 894445, at *14.  The plaintiffs' § 1983 claim, like the one in *Fischer*, must be dismissed.

The plaintiffs raise three arguments in defense of their conspiracy claims, none of which is availing.  First, the plaintiffs contend that the fact that USCP was operating on grounds within the

MPD's jurisdiction is suggestive of a conspiracy. This argument falls flat for the plain reason, discussed above, that the USCP *also* has geographic jurisdiction over the area in which the DNC headquarters is located, *and* has jurisdiction to protect Congresspeople—such as Hakeem Jeffries and Brad Sherman, both of whom were present at the DNC that evening—anywhere in the United States if instructed to do so by the Capitol Police Board. *See* 2 U.S.C. §§ 1966(a)–(b), 1967(a)(4). A simultaneous response by two police forces both of which have jurisdiction over the incident in question, standing alone, raises no suspicion of an unlawful conspiracy *between* them, even if some unlawful acts are committed by both agencies in the course of their respective responses.

Second, the plaintiffs argue that they plausibly alleged "that the MPD and USCP Defendant Officers 'formulated a plan to disrupt the protest with brute force,'" Individual Capacity Opp'n at 18 (quoting Am. Compl. ¶ 95). Specifically, they claim that the "[s]upervising MPD and USCP Defendant Officers 'preauthoriz[ed] lower-ranking Defendant Officers to behave violently without provocation,'" *id.* (quoting Am. Compl. ¶ 95), which the lower-ranking officers then proceeded to do. Even taking this bald assertion at face value, it suggests *at most* that conspiracies existed *within* each of the two police departments to violate the plaintiffs' constitutional rights. To reiterate, in order to show that the federal defendants were acting under color of state law, the plaintiffs must plead facts sufficient to plausibly allege a conspiracy *between* the two police departments, which they have not done. Plaintiffs do not claim, for example, that MPD supervising officers authorized or encouraged lower-ranking *USCP officers* to use forceful crowd-control tactics against the protesters, or otherwise "gave [them] the power" to act as they did. *Williams*, 396 F.3d at 415. Nor do they allege an agreement between the two departments' supervisors to

coordinate an unlawful response by their respective subordinates.[7]  The commission of independent wrongful acts by two distinct entities does not constitute a conspiracy, even if each actor's conduct is internally premeditated.

Finally, the plaintiffs claim that USCP and MPD both covered up their officers' respective conduct at the protest, and that these parallel cover-up operations evince a conspiracy between the agencies.  Specifically, the plaintiffs claim that the MPD failed to generate use-of-force reports as it was required to do under MPD General Order 901.07 and, as stated above, that USCP's press release published after the incident was falsified.  This allegation suffers from a by-now familiar and fatal flaw: even if accepted as true for purposes of this Motion, it remains a paradigmatic example of "parallel conduct that could just as well be independent action."  *Acosta Orellana*, 711 F. Supp. 2d at 114 (citing *Twombly*, 550 U.S. at 557).  Even if both agencies did indeed perpetrate cover-ups, the plaintiffs provide no reason whatsoever for the Court to think that they did so pursuant to any agreement between them, i.e. in order to shield each other from liability.  Indeed, USCP's supposedly false statement does not so much as mention the MPD, nor do the MPD's reporting guidelines seemingly obligate the MPD to report the use of force by officers of other law enforcement agencies in the first place.  *See* GO 901.07 at 12–22,

---

[7] The plaintiffs, citing MPD General Order 801.01, argue that "MPD was responsible for planning the agency's protest response, including by coordinating with USCP."  Individual Capacity Opp'n at 18; Am. Compl. ¶ 1 n.2; *see also* Individual Capacity Surreply at 15 n.4.  General Order 801.01 prescribes the MPD's crowd management and civil unrest procedures, and provides that, "[w]hen this is necessary, the [MPD] Office of Communications shall institute, or become part of, a Joint Information Center (JIC)" for the purpose of "exchang[ing] information and establish[ing] protocol for the coordinated release of information" with other law enforcement authorities, which may include the Capitol Police.  GO 801.01 at 40, https://go.mpdconline.com/GO/GO_801_01.pdf [https://perma.cc/MTQ6-7K34].

This general statement of MPD's policies and procedures simply does not support the assertion that MPD "plann[ed] the . . . protest response . . . by coordinating with USCP," and falls far short of establishing a conspiracy between the two agencies.  The mere fact that MPD's internal guidelines allow for the creation of a JIC to share information with USCP does not suggest even that a JIC was in place on the date of the alleged incidents, much less that any hypothetical JIC in existence on that day was used to formulate and effectuate a conspiracy to violate the plaintiffs' constitutional rights.  In other words, the General Order raises, at most, one *means* by which MPD *could* speculatively formulate a conspiracy with USCP.  By the plaintiffs' flawed logic, the fact that both agencies have access to phones and email, both of which can be used to exchange information, would also constitute evidence of a conspiracy.

https://go.mpdconline.com/GO/GO_901_07.pdf [https://perma.cc/4838-P5LS]. Therefore, even assuming for purposes of this Motion that each agency conducted a cover-up operation to evade liability for constitutional violations, the plaintiffs have not plausibly alleged that they conspired *with each other* to do so, as is necessary to establish that USCP acted under color of state law.[8]

Setting aside these claims, which show nothing more than parallel conduct, all that remains of the plaintiffs' conspiracy allegations are wholly conclusory assertions that certain defendant officers acted "pursuant to a civil conspiracy" with their counterparts from the other agency. Am. Compl. ¶¶ 31, 32, 34, 265, 287, 310, 319. But on a motion to dismiss for lack of subject-matter jurisdiction, a district court "need not 'accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations.'" *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 44 (D.D.C. 2017) (quoting *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001)); *cf. Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (reiterating the same principles in the context of a standing dispute). To reiterate, it is the plaintiffs' burden to demonstrate that this Court possesses subject-matter jurisdiction; they plainly have not done so here.[9]

---

[8] The plaintiffs' citations to *Kivanc v. Ramsey*, 407 F. Supp. 2d 270 (D.D.C. 2006), and *Blakeney v. O'Donnell*, 117 F. Supp. 3d 6 (D.D.C. 2015), are inapposite. In each case, the court held that the plaintiffs' allegations that police officers conspired *among themselves* to falsify reports to conceal assault and battery perpetrated against the respective plaintiffs stated a civil conspiracy claim, and that these claims were not barred by the so-called intracorporate conspiracy doctrine. *Kivanc*, 407 F. Supp. 2d at 275–76; *Blakeney*, 117 F. Supp. 3d at 14–17. In other words, both cases concern the requirements for pleading a conspiracy *within* a police department. Neither case suggests that if two different agencies both happen to cover up their involvement in a particular incident, the Court may reasonably infer that a conspiracy exists *between* those two agencies, as the plaintiffs here must allege to avoid dismissal.

[9] The Court pauses briefly to note an ancillary issue in the plaintiffs' briefing itself. In *Leonard v. George Washington University Hospital*, as in this case, the Court dismissed a § 1983 claim against certain federal defendants (FBI and Capitol Police officers) because the plaintiff had failed to allege in non-conclusory fashion that those federal defendants had colluded with local government actors to deprive him of his constitutional rights. 273 F. Supp. 3d at 255 n.6. Attempting to distinguish their own Amended Complaint from *Leonard*, the plaintiffs quote a passage from that case in which the court noted that the plaintiff had alleged "*no* facts" in support of his alleged conspiracy. Individual Capacity Opp'n at 15. The plaintiffs have misrepresented this quotation from *Leonard*: The passage actually reads that the plaintiff had alleged "no *facts*" to support his alleged conspiracy. 273 F. Supp. 3d at 255 n.6. The plaintiffs switched the emphasis from "facts" to "no," without signaling their alteration to the Court. The defendants point this out in their reply brief, *see* Individual Capacity Reply at 3, but the plaintiffs do not so much as acknowledge their error in their surreply.

Reviewing the Amended Complaint in context only magnifies its shortcomings. The need to distinguish between conspiracy and parallel conduct is at its apex "where the defendant's allegedly unlawful conduct has 'an obvious alternative explanation . . . .'" *Vindman*, 2022 WL 16758575, at *4 (quoting *Twombly*, 550 U.S. at 567). Both the Amended Complaint and the USCP press release incorporated by reference therein note that at least one protester was arrested for assaulting a police officer. *See* Am. Compl. ¶ 99; USCP Statement. The press release and the social media post by Congressman Brad Sherman, also mentioned in the Amended Complaint, allege further unlawful conduct by the protesters. USCP Statement; Am. Compl. ¶ 98 & n.52. These facts furnish a possible alternative explanation for the MPD and the federal defendants' conduct: each agency independently decided to use force in response to the protesters' unlawful and potentially violent acts that threatened the safety of at least two Congressmen. Though the Court may not weigh the relative likelihood of the parties' competing accounts at this early stage of litigation, this alternate narrative underscores that the plaintiffs' conspiracy allegations fall well short of the mark. *Cf. Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 39–40 (D.D.C. 2021) (dismissing a conspiracy claim against federal law enforcement and political officials because "the management of possible violence . . . generate[d] [an] 'obvious alternative explanation[]' . . . for the defendants' communications and activities other than having formed an agreement to violate the plaintiffs' civil rights") (quoting *Iqbal*, 556 U.S. at 682) (internal quotation omitted).

---

This alteration, though seemingly small, is significant. If the emphasis is on "no," the natural implication is that the plaintiffs' pleadings need only contain some modicum of factual content to survive dismissal—a reading of *Leonard* that is highly favorable to the plaintiffs. On the other hand, if the emphasis is on "facts," the implication is that a plaintiff cannot avoid dismissal merely by speculating, hypothesizing, or reciting legal conclusions—a reading that is more consistent with *Twombly*, and relatively more favorable to the defendants. *See* 550 U.S. at 564, 569–70.

Giving the plaintiffs the benefit of the doubt, the Court will assume that the plaintiffs' misrepresentation of *Leonard* was an honest mistake, rather than a dishonest and self-serving attempt to contort the case law to suit their ends. Nevertheless, the plaintiffs are strongly admonished that litigants must take care to accurately represent legal authorities to the Court. Any future errors of this sort will be met with greater skepticism.

In sum, the plaintiffs' attempt to shoehorn their allegations into a supposed conspiracy between USCP and MPD capable of sustaining their § 1983 action flounders for a single commonsensical reason: the fact that two actors behaved in a similar way at the same place and time is not *prima facie* evidence of an agreement between them, especially when there is an obvious alternative explanation for their parallel conduct. The plaintiffs have raised no factual allegations suggesting, for example, that any communication took place between MPD and the federal defendants about a plot to violate the plaintiffs' constitutional rights or to cover up such violations, nor do they suggest how, when, or why such communication may have happened. Neither do they adduce any facts suggesting that such a scheme emerged tacitly between the agencies at any time. The plaintiffs have accordingly not met their burden to show that the federal defendants acted under color of D.C. law during the events alleged in the Amended Complaint. Therefore, the Court lacks subject-matter jurisdiction to entertain the plaintiffs' § 1983 claims against the federal defendants, and those claims will be dismissed as a result.

**B. The Court Lacks Jurisdiction Over the Plaintiffs' Common Law Assault and Battery Claim Because the Plaintiffs Have Not Exhausted Administrative Remedies**

The defendants argue that the plaintiffs' common law assault and battery claim should be dismissed because they have not pleaded administrative exhaustion as required by the FTCA. The plaintiffs do not contend that they have met the FTCA's requirements, nor could they: as discussed above, their Standard Form 95 was filed more than a month after the initiation of this action, whereas the FTCA requires that a plaintiff's SF-95 be either pending for six months or rejected by the recipient agency before a suit may be commenced in court. *GAF Corp.*, 818 F.2d at 905.

Instead, the plaintiffs raise a nearly, but not entirely, novel argument: that the remedial-jurisdictional framework created by the Westfall Act and the FTCA contains an exception for

common law tort claims brought to vindicate and remedy the violation of constitutional rights—in this case, the protections of the First and Fourth Amendments.[10]  The plaintiffs rely heavily on a recent concurrence penned by Judge Walker of the D.C. Circuit in *Buchanan v. Barr*, an appeal of multiple consolidated actions challenging the law enforcement response to protests that took place in D.C.'s Lafayette Square in June 2020.  71 F.4th 1003, 1006 (D.C. Cir. 2023) (explaining the factual background); *id.* at 1012–18 (D.C. Cir. 2023) (Walker, J., concurring); *see* Individual Capacity Opp'n at 9–14 (citing Judge Walker's *Buchanan* concurrence throughout).

The argument proceeds as follows: The Westfall Act bars most "civil action[s] . . . for money damages" to redress "injury or loss . . . resulting from" unlawful acts or omissions of federal employees in the course of their employment, unless the plaintiff proceeds through the FTCA's exhaustion scheme.  28 U.S.C. § 2679(a)–(b)(1); *see Hui v. Castaneda*, 559 U.S. 799, 806 (2010) ("The Westfall Act amended the FTCA to make its remedy against the United States the exclusive remedy for most claims against [federal] Government employees arising out of their official conduct.").  But the Westfall Act's exclusive-remedy provision contains an exception for "civil action[s] against an employee of the Government . . . which [are] brought for a violation of the

---

[10] The defendants accuse the plaintiffs of raising this argument for the first time in their opposition, and argue that they should not be allowed to amend their complaint in their briefing.  Individual Capacity Reply at 5.  This accusation is not entirely farfetched.  As already noted, the plaintiffs filed an SF-95 after submitting their original complaint; it is certainly conceivable that the plaintiffs realized only *after* the defendants filed their first Motion to Dismiss that their claims would likely be barred by the FTCA, and that they therefore needed to advance an alternative theory to preserve them.  Moreover, the Amended Complaint reads "USCP Defendant Officers are liable under the Westfall Act for committing the torts of assault and battery, and, in so doing, violating Plaintiffs' First and Fourth Amendment rights."  Am. Compl. ¶ 197; *see also id.* ¶ 266.  As discussed in the pages that follow, the Westfall Act *may* contain an *exception* for state tort claims of which a constitutional violation is an element of the cause of action, but the Westfall Act does not provide an independent cause of action for such claims unto itself, as the plaintiffs' use of the word "under" suggests.  If the plaintiffs meant to articulate this theory from the beginning, the more natural way to word their argument would have been that the federal defendants are *exempt from* the requirements of the Westfall Act (or are liable *despite* the Westfall Act) because their tortious conduct violated the plaintiffs' constitutional rights.

Nevertheless, although the Amended Complaint could certainly be clearer on this point, it does mention the federal defendants' alleged constitutional violations in tandem with the common law assault and battery count, and refers on multiple occasions to the Westfall Act's exception for claims "brought for a violation of the Constitution of the United States . . . ."  28 U.S.C. § 2679(b)(2)(A).  Therefore, the Court does not perceive this argument as an untimely effort by the plaintiffs to further amend their Complaint through briefing, and will consider it in full.

Constitution of the United States . . . ." 28 U.S.C. § 2679(b)(2)(A). This "constitutional exception" has generally been understood as a carveout to accommodate *Bivens* actions; all nine justices of the Supreme Court characterized it as such as recently as 2020. *See Hernandez v. Mesa*, 589 U.S. 93, 111 n.9 (2020) (Alito, J., for a five-justice majority) (explaining that, "[b]y enacting [28 U.S.C. § 2679(b)(2)(A)], Congress made clear that it was not attempting to abrogate *Bivens* . . . ."); *id.* at 129 (Ginsburg, J., for a four-justice dissent) ("Even as the Westfall Act amended the FTCA to make it the 'exclusive' remedy for scope-of-employment claims against Government officers, Congress carved out an exception for *Bivens* suits, § 2679(b)(2)(A) . . . .) (internal citation omitted).

However—so goes the plaintiffs' argument, mirroring Judge Walker's—confining § 2679(b)(2)(A) to *Bivens* suits alone may be too narrow a reading of that provision. "Long before *Bivens*," they write, "state tort law provided a crucial check on federal agents who violate the [C]onstitution or otherwise abuse their power." Individual Capacity Opp'n at 10; *see also Buchanan*, 71 F.4th at 1014 (Walker, J., concurring) (stating that "[f]or most of our history, state tort suits were the primary mechanism for holding federal officers accountable" for constitutional violations) (citing *Hernandez*, 589 U.S. at 115–16 (Thomas, J., concurring)). Enforcing constitutional rights via state tort suits was consistent with the expectations of the Framers, with the English common law tradition, and with Founding-era practice. *See* Individual Capacity Opp'n at 11; *Buchanan*, 71 F.4th at 1014–15 (discussing the ratification debates, English and American cases from the mid-18[th] and early 19th centuries, and the First Judiciary Act's requirement that federal marshals post sureties to offset their deputies' potential liability under state law). The plaintiffs seem to argue that, between the narrow prevailing interpretation of § 2679(b)(2)(A) and the Supreme Court's resistance to expanding *Bivens*, some victims of constitutional violations at the hands of federal officials are left with no remedy at all. Individual Capacity Opp'n at 13–14

(citing *Buchanan* for the proposition that the prevailing interpretation of the Westfall Act's constitutional exception creates a "remedial gap"); *see also Buchanan*, 71 F.4th at 1015–16 & n.4 (collecting scholarly and judicial authority for the notion that "prohibiting all damages actions against federal officers might be a constitutional problem today," but "tak[ing] no position on whether those scholars and judges are correct . . . ."); *id.* at 1013–14 (discussing the limitations of the FTCA and *Bivens*); *but see Black Lives Matter D.C. v. Trump*, No. 20-cv-1469-DLF, 2024 WL 3300158, at *8 (D.D.C. July 4, 2024) ("[T]he Westfall Act does not leave anyone forum-less.").

The solution, according to the plaintiffs, is to re-interpret the words "brought for a violation of the Constitution" in § 2679(b)(2)(A) more broadly, a theory for which the plaintiffs look to Judge Walker's *Buchanan* concurrence for support. In addition to being at least arguably consistent with the text itself, he writes, a broader interpretation of § 2679(b)(2)(A) might also be easier to square with the statute's historical context: the case that it was intended to abrogate, *Westfall v. Erwin*, 484 U.S. 292 (1988), involved a negligence action with no constitutional dimension, and one might expect Congress to have used "exceptionally clear language" if it meant to undo the longstanding practice of using state tort claims to hold federal officials accountable for constitutional breaches. *Buchanan*, 71 F.4th at 1017; *see also* Carlos M. Vázquez & Stephen I. Vladeck, *State Law, the Westfall Act, and the Nature of the Bivens Question*, 161 U. Pa. L. Rev. 509, 570–77 (2013) (discussing various textual, historical, and constitutional reasons to favor a broader interpretation of § 2679(b)(2)(A)).

Judge Walker proposes two specific possibilities for reinterpreting § 2679(b)(2)(A). The first, more expansive reinterpretation—which this Court hereinafter terms the "purposive interpretation"—is that the statute permits state tort claims where the action's *purpose* is to remedy a constitutional violation." *Buchanan*, 71 F.4th at 1016 (emphasis in original). The

second, narrower interpretation—hereinafter the "cause-of-action interpretation"—is that the statute permits state tort claims only where "a constitutional violation is part of the plaintiff's cause of action," i.e. where a plaintiff must plead a constitutional violation as an element of the tort.  *Id.* at 1016 (collecting authority); *see also* Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1512–17 (1987) (proposing a model "converse-1983" statute which would make federal officials liable under state law for violations of the federal Constitution).  The plaintiffs naturally favor the more capacious purposive interpretation, but believe that their claims survive under either theory.  Individual Capacity Opp'n at 14 ("Plaintiffs bring assault and battery claims to vindicate violations of the United States Constitution."); Individual Capacity Surreply at 4–6.

Ultimately, Judge Walker concluded that he was "not certain whether the Westfall Act is best read to allow state tort suits for constitutional injuries," and instead expressed his "hope [that] the Act gets close attention in an appropriate case."  *Id.* at 1017.  Since extending that invitation, the Court is aware of only one judge who has approvingly cited Judge Walker's hypothesized reading of § 2679(b)(2)(A), who did so in an unpublished concurrence and without specifying whether he favored the purposive or cause-of-action interpretation.  *See Cross v. Buschman*, No. 22-3194, 2024 WL 3292756, at *5 n.12 (3d Cir. July 3, 2024) (Matey, J., concurring).  The few district courts that have considered Judge Walker's proposed constructions have approached them with skepticism and uniformly declined to adopt them.  *See, e.g.*, *Pompy v. Moore*, No. 19-10334, 2024 WL 845859, at *12 (E.D. Mich. Feb. 28, 2024) (Lawson, J.); *see also Pearsons v. United States*, 723 F. Supp. 3d 825, 833 (C.D. Cal. 2024) (Klausner, J.); *Quiñonez v. United States*, No. 22-cv-3195-WHO, 2023 WL 5663156, at *2–3 (N.D. Cal. Aug. 30, 2023) (Orrick, J.).

After the decision in *Buchanan*, the plaintiffs in one of the Lafayette Square protest cases amended their complaint to add D.C. law claims against the federal defendants in that case, then

objected to the defendants' Westfall certification, arguing that their state law claims could proceed because they were "brought for a violation of the Constitution of the United States." *Black Lives Matter D.C.*, 2024 WL 3300158, at *3–4. Judge Friedrich reasoned that she need not decide whether the prevailing "*Bivens*-only" construction of § 2679(b)(2)(A) or the cause-of-action interpretation is correct, because the plaintiffs' claims could have survived only under the purposive interpretation, which she rejected as inconsonant with the text and context of the Westfall Act. *Id.* at *5–6.

Judge Friedrich gave five reasons for rejecting the purposive interpretation: First, because "[a] great many lawsuits concern or regard constitutional violations in *some* way," adopting the purposive reading would result in the statute "assuming near-infinite breadth," an outcome generally disfavored by courts. *Id.* at *5 (emphasis in original) (quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016)). Second, § 2679(b)(2)(B)—which exempts actions "brought for a violation of a statute of the United States under which such action . . . is otherwise authorized"—has not been given a purposive reading by the courts, so to adopt the purposive interpretation of § 2679(b)(2)(A) would be to irrationally read essentially "'identical words and phrases within the same statute'" differently. *Id.* (quoting *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007)). Third, the purposive interpretation of the words "brought for a violation of" in § 2679(b)(2)(A) would create inconsistencies with other provisions of the U.S. Code, which often use the same or similar language to mean that the underlying action must "directly assert causes of action created by those sections or . . . allege violations of those sections as an element of another claim." *Id.* (collecting cases and statutes). Fourth, the purposive interpretation is out of step with similar language in the Tucker Acts: 28 U.S.C. §§ 1346(a)(2) and 1491(a)(1) waive sovereign immunity for certain actions "founded . . . upon the Constitution," a

phrase which has been variously interpreted to encompass claims asserting a constitutional violation "either as a freestanding cause of action or as an element of another claim," but not those that are merely "brought to vindicate a constitutional right in an abstract sense." *Id.* at *6 (collecting cases). Fifth and finally, because "an action does not 'arise under' the Constitution unless it 'necessarily raise[s]' a constitutional question," the purposive interpretation would encompass some claims over which the federal courts lack federal question jurisdiction under 28 U.S.C. § 1331, whereas the cause-of-action and *Bivens*-only interpretations would include only claims that the federal courts are otherwise empowered to hear. *Id.* (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)); *see also Pompy*, 2024 WL 845859, at *12 (rejecting the purposive interpretation because a state tort action brought for the *purpose* of remedying some constitutional violation, but "where the Constitution does not provide relief or create the cause of action itself," does not "'arise under' the Constitution or federal law" and therefore "would find no home in a federal courthouse").

The Court adopts this reasoning in full. The purposive interpretation of the Westfall Act's constitutional exception is inconsistent with the text, with commonly accepted principles of statutory interpretation, and with the broader structure of the U.S. Code. The Court need not decide whether the prevailing *Bivens*-only approach or the cause-of-action interpretation is right because, as in *Black Lives Matter D.C.*, the plaintiffs' claims in this case could move forward only under the now-rejected purposive interpretation. Their claims do not survive under the *Bivens*-only construction because, definitionally, a common law assault and battery claim is not a *Bivens* claim, and indeed the plaintiffs have expressly disavowed any *Bivens* claims. *See* Individual Capacity Opp'n at 4 ("Plaintiffs do not seek relief under *Bivens*."). Nor could the plaintiffs' common law claims survive even if the Court were to adopt the cause-of-action interpretation of

28

§ 2679(b)(2)(A), because neither common law assault nor common law battery requires a plaintiff to plead a constitutional violation as part of the cause of action. To wit: Under D.C. common law, assault is defined as an "intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff," and battery as an "intentional act that causes harmful or offensive bodily contact." *Dist. of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003). In a prototypical assault and battery case—i.e., one not involving a government actor—a plaintiff will be able to maintain his cause of action without alleging that the defendant violated his constitutional rights. Therefore, much like the negligence *per se* and First Amendment Activities Act violations alleged and ultimately rejected in *Black Lives Matter D.C.*, *see* 2024 WL 3300158, at *9, the plaintiffs' common law claim fails to fit into either of the plausible interpretations of § 2679(b)(2)(A).[11]

Resisting this conclusion, the plaintiffs' surreply offers three primary counterarguments in favor of the purposive interpretation of § 2679(b)(2)(A). The first argument is that the Supreme Court recognized the ongoing viability of state tort suits to redress constitutional injuries as

---

[11] The D.C. Code provides that "[a]ny officer who uses unnecessary and wanton severity in arresting or imprisoning any person shall be deemed guilty of assault and battery, and, upon conviction, punished therefor." *Chinn*, 839 A.2d at 705 (quoting D.C. Code § 5-123.02). Count II of the Amended Complaint alleges only *common law* assault and battery, and does not invoke § 5-123.02 or any other provision of the D.C. Code. The plaintiffs mention this provision for the first time in their opposition brief, *see* Individual Capacity Opp'n at 14, and attempt to explain its significance for the first time in their *surreply*. Individual Capacity Surreply at 6. This is a textbook example of attempting to amend a complaint through opposition briefing, which the plaintiffs may not do. *See Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 87 n.4 (D.D.C. 2010) ("[P]laintiff[s] may not amend [their] complaint[s] by the briefs in opposition to a motion to dismiss."), *aff'd*, 424 Fed. App'x 10 (D.C. Cir. 2010).

However, even if the plaintiffs *had* incorporated § 5-123.02 in their pleading, and even if the Court were inclined to adopt the cause-of-action interpretation of § 2679(b)(2)(A), it does not appear to the Court that their claim would survive anyway. First, it is not clear that § 5-123.02 provides a private cause of action for assault and battery; it appears to be a criminal statute that has generally been invoked in civil cases to establish a duty of care for a negligence action. *See, e.g.*, *Chinn*, 839 A.2d at 705; *Dormu v. Dist. of Columbia*, 795 F. Supp. 2d 7, 31 (D.D.C. 2011); *Jones v. Ritter*, 587 F. Supp. 2d 152, 160 (D.D.C. 2008). The plaintiffs have not brought a negligence action against the federal defendants. More importantly, § 5-123.02 does not explicitly require the plaintiff to plead a constitutional violation as an element of the offense. One might argue that, through its "unnecessary and wanton severity" language, the statute implicitly means to capture Fourth Amendment violations. But it is far from clear that this language is co-extensive with and intended to incorporate the protections of the federal Constitution's Fourth Amendment.

To reiterate, no court has yet adopted the cause-of-action interpretation of § 2679(b)(2)(A). Whether a state statute could come within that interpretation by implication, and whether D.C. Code § 5-123.02 does so, are questions that must be left for a case where they are properly before the Court.

recently as 2007 when, in *Wilkie v. Robbins*, it wrote that a rancher suing federal officials under *Bivens* did not need a new *Bivens* remedy because he "had a civil remedy for trespass." 551 U.S. 537, 551 (2007). But Judge Friedrich, presented with the same argument in *Black Lives Matter D.C.*, countered that "the *Wilkie* Court may well have meant a trespass action against the United States *under the FTCA*," rather than via the Westfall Act's constitutional exception. 2024 WL 3300158, at *8 (emphasis added). Given that the Westfall-FTCA framework has been generally understood for decades as the exclusive remedy for torts committed by federal officials, Judge Friedrich's reading of that passage from *Wilkie* strikes the Court as more logical than the plaintiffs'. Under the assumption that the Supreme Court, like Congress, does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 US. 457, 468 (2001), this Court will not presume that the Supreme Court flippantly upended the *Bivens*-only consensus with a passing remark in *Wilkie*, only to never mention it again. *Cf. Castaneda*, 559 U.S. at 809 (referring to § 2679(b)(2)(A) as the "Westfall Act's *Bivens* exception" less than three years after *Wilkie*).

Second, the plaintiffs bring up the Westfall Act's historical context, remarking that the *Westfall* case did not involve constitutional claims, and that Congress twice (in 1973 and 1988) rejected DOJ proposals that would "funnel all liability [for intentional tort suits against federal officers] into claims brought against the government rather than individual officers." *Meshal v. Higgenbotham*, 804 F.3d 417, 428 (D.C. Cir. 2015). With respect to the context of the *Westfall* case, Judge Friedrich found this argument unpersuasive: "Although Congress drafted the Act in response to *Westfall*, a non-constitutional case, it does not follow that the words it wrote lack implications for cases related to constitutional violations." *Black Lives Matter D.C.*, 2024 WL 3300158, at *7 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 23 U.S. 75, 79 (1998)). This Court agrees: The fact that the *Bivens*-only and cause-of-action interpretations of the Act's

constitutional exception would bar some constitutionally inflected claims that do not closely resemble the facts of *Westfall* itself is not so eyebrow-raising as to require acceptance of the purposive interpretation, especially given the many strong reasons to reject it, as stated above.

Congress's rejection of the DOJ's legislative proposals does not favor adoption of the purposive interpretation either. It appears to this Court that Congress may have rejected the 1973 and 1988 proposals for any number of reasons, one being that those proposals would have done away with *Bivens* by making suit against the federal government the exclusive remedy in all scope-of-employment cases against federal officials. *See* Jack Boger et al., *The Federal Tort Claims Act Intentional Torts Amendment: An Interpretive Analysis*, 54 N.C. L. Rev. 497, 510–17 (1976) (discussing the proposed 1973 amendment, including its proposal to "ma[ke] the governmental remedy exclusive," and noting that the Senate Committee's counterproposals "were attacking the problem almost exclusively from the perspective of *Bivens* and section 1983"); *see also* James E. Pfander & David Baltmanis, *Rethinking Bivens: Legitimacy and Constitutional Adjudication*, 98 Geo. L.J. 117, 135 & nn.99–100 (2009) (noting that Congress rejected DOJ's proposals "in the early 1970s" and again in 1988 "in favor of preserving the *Bivens* action"). In other words, the rejection of the DOJ's 1973 and 1988 proposals to channel *all* intentional tort suits against federal employees into suits against the U.S. government is at least as consistent with the *Bivens*-only interpretation of § 2679(b)(2)(A) (and, for that matter, with the cause-of-action interpretation) as with the purposive interpretation.

Third, the plaintiffs gesture to the House Report accompanying the Westfall Act, which stated that the bill "would not affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their Constitutional rights." H.R. Rep. No. 100-700, at *6 (1988). But this statement, too, is consistent with the *Bivens*-only interpretation of

the Westfall Act's constitutional exception: in the lead-up to 1988, it was widely expected that *Bivens* was and would remain the primary means for plaintiffs to seek redress from federal officials for constitutional violations. *See Black Lives Matter D.C.*, 2024 WL 3300158, at *7 (citing *Carlson v. Green*, 446 U.S. 14, 18–23 (1980) (construing *Bivens* broadly, and ultimately holding that the plaintiff had a *Bivens* remedy even though a remedy was also available under the FTCA)). Indeed, the very House Report that the plaintiffs cite explicitly uses "constitutional torts" and "*Bivens* torts" interchangeably, and draws a "sharp distinction" between those two types of torts on the one hand and "common law torts" on the other. H.R. Rep. No. 100-700, at *6.[12]  This language strongly suggests that its authors drafted § 2679(b)(2)(A) with an eye to preserving *Bivens* actions, and paid no mind to preserving the pre-FTCA tradition of state common law constitutional tort claims.

Because the plaintiffs' common law assault and battery claims do not fall into the Westfall Act's constitutional exemption under either the *Bivens*-only or the postulated cause-of-action theory, they must proceed through the FTCA's administrative exhaustion scheme if they are to proceed at all. There being no dispute here that the plaintiffs have failed to exhaust administrative remedies, those claims must be dismissed for lack of subject-matter jurisdiction.

---

[12] In their surreply, the plaintiffs quote at length a passage from the same House Report for the different proposition that "*Bivens* torts are a *subset* of the broader category of constitutional torts covered by § 2679(b)(2)(A)." Individual Capacity Surreply at 7–8 (emphasis in original). The Court has read that same passage, and finds no support in it for the plaintiffs' reading.

The plaintiffs specifically highlight a passage that defines a "constitutional tort action" as a "vehicle by which an individual may redress an alleged violation of one or more fundamental rights embraced in the Constitution. Since the Supreme Court's decision in Bivens . . . the courts have identified this type of tort as a more serious intrusion of the rights of an individual that merits special attention." H.R. Rep. 100-700 at *6. But this passage in no way suggests that *Bivens* suits were viewed as a subcategory of constitutional torts; it is at least as consistent, if not more so, with the contemporaneous view that *Bivens* had become the primary "vehicle" outside of the FTCA for rectifying "violation[s] of . . . fundamental rights embraced in the Constitution" committed by federal employees. The fact that the Supreme Court would significantly curtail *Bivens* over the decades that followed does not inform the Court's reading of a House Report issued when *Bivens* was still viewed by many as the "first line of defense against constitutional violations." *Black Lives Matter D.C.*, 2024 WL 3300158, at *7.

## IV.    CONCLUSION

The plaintiffs relinquished any claims against the federal defendants in their official capacities and made no attempt to raise a *Bivens* claim. The Court lacks subject-matter jurisdiction over their § 1983 claims because they have not successfully pleaded that the federal defendants acted under the color of D.C. law: their bare and conclusory claim that the federal defendants conspired with the MPD to violate the plaintiffs' constitutional rights are abjectly insufficient in light of the overwhelming weight of civil conspiracy case law. Finally, the Court lacks jurisdiction to entertain the plaintiffs' common law assault and battery claims for two reasons. First, they did not satisfy the FTCA's administrative exhaustion requirement. Second, their claims are not exempt from this requirement because they were not "brought for a violation of the Constitution" within the meaning of the Westfall Act's constitutional exception, under either the prevailing *Bivens*-only construction of that provision or the posited cause-of-action interpretation.

Because the plaintiffs have pleaded no claims against the federal defendants in their official capacities, the federal defendants' Motion to dismiss the plaintiffs' official capacity claims will be **DENIED AS MOOT**. And because the plaintiffs have pleaded no claim against the federal defendants in their individual capacities over which this Court may exercise subject-matter jurisdiction, the federal defendants' Motion to dismiss the plaintiffs' individual capacity claims will be **GRANTED**. A separate Order consistent with this Opinion shall issue.

Date: _____5/13/25_____

_Royce C. Lamberth_
Royce C. Lamberth
United States District Judge